The Toledo & Indiana Rd. Co. *v.* Yhalkee.

(Decided February 8, 1935.)

*Messrs. Tracy, Chapman & Welles* and *Mr. Edward W. Kelsey,* for plaintiff in error.

*Messrs. Holloway, Peppers & Romanoff,* for defendant in error.

Richards, J.   By an action commenced in the Court of Common Pleas the defendant in error, Lem Yhalkee, sought to recover a judgment against The Toledo & Indiana Railroad Company for $7,700, for alleged injuries to his person and damage to his automobile by reason of a collision between a train of the railroad company and his automobile, occurring at about 7:30

o'clock in the evening of January 27, 1933. The trial resulted in a verdict in his favor in the sum of $870, upon which judgment was entered.

By its petition in error, the railroad company seeks a reversal of this judgment on the sole ground that the trial court erred in failing and refusing to direct a verdict in its favor, a motion therefor having been made both at the close of the evidence produced by Yhalkee and at the conclusion of that offered and received in its behalf. For this purpose no motion for a new trial was necessary and none was filed, the weight of the evidence not being involved.

The basis of the contention of the railroad company is that the evidence adduced at the trial is such that reasonable minds must conclude that Yhalkee was guilty of contributory negligence. Four grounds of negligence are alleged in the petition of Yhalkee:

1. In that the defendant by its agent and servant failed and omitted to sound a whistle at such time before arriving at said crossing, or ring a bell continuously upon arriving at said crossing and until the said interurban freight train had passed over said crossing.

2. In that said defendant company had failed at said time and place to provide any signalling system to protect vehicles crossing said interurban tracks on said highway.

3. In operating its said interurban freight train upon and over said crossing at a higher rate of speed than was reasonable and proper, in this, to wit, more than thirty miles per hour under the then existing conditions at said time and place.

4. In that after the defendant, by and through its agent, saw the automobile of plaintiff crossing said tracks at said time and place, although it knew or by the exercise of ordinary care on its part should have known, that to continue its operation of its said inter-

urban train at said rate of speed of thirty miles per hour would result in a collision, but notwithstanding said knowledge by the defendant, it failed to slacken its speed or stop its said train in time to avoid said collision, but continued the operation of said train until it collided with the automobile of plaintiff.

The trial judge in his charge to the jury eliminated from consideration all of the foregoing claims of negligence on the part of the railroad company except No. 1, and our examination of the record convinces us that he was right in so doing.

The collision occurred at the crossing of Sibley Road and the tracks of the railroad, Sibley Road being a public highway located in Lucas county about four miles west of Toledo. Yhalkee lived on the east side of this highway in the first house, approximately 60 feet south of the railroad tracks. The house fronts on Sibley Road about 18 feet from the paved portion thereof. On the north side of the house is a driveway and there are no obstructions to a clear view of the railroad tracks in a northeasterly direction for at least a distance of 500 feet. There is a slight slope upward in Sibley Road as it approaches the track. Yhalkee was fully familiar with the location of the tracks and of the fact that cars and trains were operated thereover, the railroad being an electric interurban, not a steam road. Prior to the time of the collision, Yhalkee, accompanied by his wife and daughter, had left his home to visit his parents in Swanton, with whom they frequently stayed over week-ends. After proceeding a portion of the way they decided because of a snowstorm not to go further, and, turning around, proceeded homeward. Reaching home, Yhalkee stopped the automobile on the driveway at the rear of his house, the rear of the automobile being about 35 feet from the entrance to Sibley Road. He, his wife and his daughter got out of the automobile, the wife and

daughter immediately going into the house and he remaining to wipe off the snow which had gathered on the right front side of the windshield, there being an automatic wiper on the left side thereof. He then got into the car, intending to go to the grocery to get some meat and bread for breakfast. He backed out of the driveway into Sibley Road, stopped and looked , to the right, and seeing or hearing nothing started forward in first speed, and when "fifteen, twenty feet, maybe fifteen, eighteen feet," from the railroad crossing, he again stopped, shifted his gears to second speed and continued to and over the crossing at a speed, he says, not in excess of 4 or 5 miles an hour. The snow was falling in heavy, wet flakes and there was a strong wind, but the headlights on his automobile were burning brightly and he says he could see ahead through the storm 40 or 50 feet and that at the speed his car was traveling could have stopped within a distance of 4 or 5 feet. He did not hear any whistle or bell, nor did he see the train until the instant of the collision.

The train consisted of four freight cars, loaded with crushed stone, drawn by an electric motor car. The motor car struck the right middle part of the Yhalkee automobile.

Mrs. Yhalkee testified that almost immediately after she entered the house the "whistle shrieked" at almost the same time as she heard the crash, and that there was no whistle before that. Asked as to whether the headlights on the front of the electric car were burning after the collision, she answered "they were lit."

A Mr. Shortridge, a garage operator, testified that at the time of the collision he was working on a motor in the basement of his house, which is located about 175 feet north from the railroad crossing. He said he heard one shrill whistle and then the crash, and that he heard no other signals. He stated also that the

Yhalkee automobile was in second speed when it was removed from the track for the purpose of taking it to his garage. Another witness was walking on a road that parallels and then crosses the railroad tracks, and when he was between 50 and 60 feet from Sibley Road saw Yhalkee's automobile parked in the driveway. He saw the automobile back out of the driveway, and says he could see the headlight and that the automobile straightened up and came to a stop, and that after it came to a stop it started forward towards the tracks from which Yhalkee was then about 15 feet distant. Because of the snow the witness was walking with his head down, and, after seeing Yhalkee move out from the driveway to Sibley Road and move toward the tracks, he did not look up again until he heard the crash, when he was about 30 feet from the crossing. He says "I was looking down" and "heard no street car or saw no street car. I heard one long whistle" but "it was blown so quickly to the crash that I couldn't say whether it was right at the time of the crash or a few seconds before."

The foregoing is the substance of all of the evidence offered by Yhalkee at the trial, which related to the alleged negligence of the railroad company and to the negligence of Yhalkee.

The motorman and conductor of the train and two other witnesses were called by the plaintiff in error. The motorman and conductor testified that the headlight on the train was burning brightly and lighted the track for 500 feet ahead, and for 50 feet on either side thereof; that there was an air whistle on the motor car, operated by pulling a cord; that 450 feet or 500 feet from the Sibley Road crossing a signal was given by two long and two short blasts on the whistle. The operators of the motor car saw Yhalkee's automobile being backed out of the driveway and the motorman then again blew the whistle, two long and two short blasts, the train at that time being about

300 feet from the crossing and proceeding at not more than 15 or 16 miles an hour. Seeing Yhalkee's automobile moving towards the tracks, the motorman blew several short blasts of the whistle as the train continued towards the crossing, and when he realized that the automobile was not going to stop he applied the emergency brakes. When the train stopped, the rear car thereof was on the crossing. The headlight was still burning after the collision, but the lens was broken.

Claude Becker, on his way to a meeting of the American Legion, and when about three-quarters of a mile from the place of the collision, heard several short blasts of the whistle followed by a crash, but he had no knowledge of where the train was when the whistle was blown.

A Mrs. Wentz of Cleveland, who was visiting her mother on the east side of Sibley Road about 200 or 250 feet north of the railroad tracks, testified that she was in the living room with her mother and heard the whistle blow "quite a while and then just before the crash heard two or three short whistles." She stated she distinctly remembered the blowing of the whistle because of the night and how weird it sounded, reminding her of a recent death in the family.

The foregoing is the substance of all of the material evidence relating to the negligence of the plaintiff in error and the contributory negligence of the defendant in error.

No positive evidence was adduced to support the claim of Yhalkee that no adequate signals were given of the approach of the train. All of the evidence offered by him in this regard was negative and to the effect only that none was seen or heard. If, as Yhalkee says, he could in spite of the snow-storm see 50 feet ahead of his car, then certainly he could have seen, had he looked, the light flashing ahead of the approaching train, which the evidence, as we view it, clearly

and indisputably shows was brightly burning. Nor have we any doubt as to the whistle having been blown and that it could and would have been heard as Yhalkee approached the tracks had he been listening and paying attention thereto. He was going, he says, only 4 or 5 miles an hour, and testified he could stop within 4 or 5 feet. Sibley Road inclines upward from his driveway toward the tracks, which would favor, or at least not retard, his ability to stop. He was unqualifiedly familiar with the location of the tracks, and, in our judgment, he invited the ensuing collision by driving directly in front of the approaching interurban cars, which, had he been looking, he would have seen in time to avoid.

In our judgment the only rational conclusion which reasonable minds can reach in the instant case is that the defendant in error was guilty of contributory negligence. *Hamden Lodge* v. *Ohio Fuel Gas Co.,* 127 Ohio St., 469, 189 N. E., 246.

The case just cited holds, by unanimous vote of the judges of the Supreme Court, that the rule which has long been known as the "scintilla rule" is no longer in force in Ohio. This decision results in giving the trial judge more authority than he possessed under the scintilla rule, and prevents much expense and delay in requiring the retrial of cases upon reversal where the only error found in the record was that it contained a scintilla of evidence in favor of the plaintiff.

The Supreme Court in the case of *J. C. Penny Co., Inc.,* v. *Robison,* 128 Ohio St., 626, 193 N. E., 401, supplementing the decision just cited, announces the following rule in the sixth proposition of the syllabus:

"Under our law it is just as pernicious to submit a case to a jury and permit the jury to speculate with the rights of citizens when no question for the jury is involved, as to deny to a citizen his trial by jury when he has the right."

As said in *Lessig* v. *Reading Transit & Light Co.*, 270 Pa., 299, 113 A., 381:

"A court cannot accept as true that which the indisputable evidence demonstrates is false. * * * Plaintiff's testimony cannot be accepted in the face of the infallible physical facts. * * * Courts are not required to believe that which is contrary to human experience and the laws of nature, or which they judicially know to be incredible. * * * The court will not stultify itself by allowing a verdict to stand, although there may be evidence tending to support it, when the physical facts demonstrate such evidence to be untrue and the verdict to be unjust and unsupported in law and in fact."

Our conclusion being as stated, the judgment of the Court of Common Pleas is reversed and final judgment is entered for the plaintiff in error.

*Judgment reversed and judgment for plaintiff in error.*

OVERMYER and LLOYD, JJ., concur.