**CLARK v. BALTIMORE & O. R. CO.**

No. 11437.

United States Court of Appeals
Sixth Circuit.

April 10, 1952.

Marston G. Bergmann and Robert H. Dawson, Cleveland, Ohio (Marston G. Bergmann, Cleveland, Ohio, on the brief), for appellant.

Dwight B. Buss, Cleveland, Ohio (William F. Marsteller, Dwight B. Buss, Cleveland, Ohio, on the brief; Baker, Hostetler & Patterson, Cleveland, Ohio, counsel), for appellee.

Before HICKS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

This is an appeal from a directed verdict of no cause of action in a personal injury suit arising out of a collision between a Baltimore & Ohio Railroad locomotive and an automobile at a grade crossing in the Village of Middleburg Heights, Ohio.

On March 24, 1948, Edna Clark, a girl thirteen years old, for whom this suit was brought, her younger sister, and another girl of about the same age, were walking along a main traveled highway in the village at about four o'clock in the afternoon, when they were offered a ride by Oliver J. Proteau, who was driving by in his automobile. Proteau was known by the children, and the girls got into the back seat of the car. Proteau, alone in the front seat, started down the highway. He lived in the vicinity, residing between 1,000 and 2,000 feet from the intersection of the railroad and the highway. As he progressed, he drove at a rate of speed of at least sixty miles an hour—perhaps seventy—down toward the railroad crossing. He successively overtook two other automobiles, passing them on the left-hand side of the yellow line in the center of the highway on the approach to the tracks, in violation of the law forbidding such passing on the approach to the crossing. At a point 470 feet from the crossing, Proteau had driven over to the left-hand side of the highway to pass the first car, which he overtook at a point later fixed at 415 feet from the crossing. At this point, there was another car ahead about 200 feet, slowing up for the crossing, and Proteau passed this car on the wrong side of the road. Apparently an instant after Proteau passed this second car, he became aware that the locomotive and train were approaching the crossing. He locked his brakes and from the evidence of the tire marks on the highway, skidded 110 feet, passing, in the course of the skid, back to the right-hand side of the highway. He crashed into the side of the locomotive as it passed over the intersection with great force, the impact killing Proteau and causing serious injuries to the three girls in the rear seat. The train had been coming down the track approaching the crossing at a

speed of about thirty miles an hour, and was brought to a stop after the collision with its third car on the roadway,

There is no issue as to the negligence of Proteau. But appellant claims that the railroad was also guilty of negligence contributing to the accident; and, since it is conceded that the negligence of Proteau is not imputable to appellant, she contends that the court was in error in directing a verdict of no cause of action, and that the question of the railroad's negligence presented an issue of fact for the jury.

The alleged negligence of the railroad is based upon the claim that the accident was due to its maintenance of a dangerous crossing in violation of the law of the State of Ohio; that, further, the engineer of the locomotive did not blow the whistle or ring the bell on his approach to the crossing, as required by state law; that this claimed negligence contributed to the accident; that the evidence presented a question of fact for the jury; and that the district court was in error, as a matter of law, in directing a verdict of no cause of action.

From an examination of the record, it is obvious that appellant has much to overcome in order to sustain the contention that the claimed failure of the railroad company to give warning signals, or the claim of maintaining an "extra-hazardous crossing" contributed to the collision. Proteau, as has been stated, lived near the crossing. He was in the habit of driving his car on the highway in question, and certainly knew of the intersection of the railroad tracks at that point better than most of the people who drove over it. Moreover, on each side of the crossing, facing the traveler on his right as he approached, were the large, familiar railroad crossarm warning signs that could be seen 1,200 feet away. On the right-hand side of the highway, 400 feet from the crossing, was the usual highway disk sign warning travelers that they were approaching a railroad crossing. Almost opposite this sign was painted on the highway a large cross with a railroad sign, "RR," to warn oncoming automobile traffic. Down the center of this straight highway

was a yellow line, warning vehicles not to pass.

In the face of the foregoing, Proteau, who must be presumed to have known the crossing, approached it at a speed of between sixty and seventy miles per hour, passing the other cars on the wrong side of the yellow warning line, disregarding his own knowledge of the crossing, as well as ignoring the three different warning signs along the highway. When he applied his brakes, leaving tire marks on the highway for a distance of more than 100 feet, he skidded into the side of the locomotive with the sound of an explosion and an impact that wrecked his car.

The law of the State of Ohio, upon which appellant relies, which requires extra precautions to be taken by a railroad for the safety of travelers at extra-hazardous, or peculiarly dangerous grade crossings, was not pleaded in the complaint, and it is only by language in certain of the cases cited in the briefs on appeal that we are made aware, specifically, that such a statute exists. The district court held that there was no evidence that the statutory precautions or provisions which are incumbent on the railroad to take were not complied with; that, on the contrary, the testimony was to the effect that all such precautions were taken; that because of the failure to introduce evidence to the effect that the crossing was of an extra-hazardous nature, there was no proof of negligence in this respect for which the railroad might be charged; and that there was no evidence in the case that the crossing was of an extra-hazardous nature.

Appellant submits that a traveler could see only 100 feet down the track from a point 121 feet from the crossing; 200 feet from a point 61 feet from the crossing; and that a clear view of 1,200 feet down the track in the direction from which the locomotive was approaching could only be had from a point on the highway 35 feet from the track because of the obstruction of a building. Because of these circumstances, counsel for appellant submits that the question as to whether the crossing was

extra-hazardous should have been submitted to a jury.

It may, however, be said that the obstruction to Proteau's view down the track had nothing to do with this accident. The skid marks of his tires on the highway show that he knew of the oncoming train at least 110 feet from the crossing, and since the Ohio courts hold that the reaction time of a driver in applying his brakes when approaching a railroad crossing, as a matter of judicial notice, is from ¾ of a second to one second, an additional 66 feet is to be added to the distance which Proteau would travel during ¾ of a second, at the speed at which he was driving. He, therefore, knew of the approaching train when he was at a point at least 176 feet from the crossing, which, as far as this case is concerned, is the same as though he had seen the train approaching when he was that distance from the crossing.

In Carter v. Pennsylvania Railroad Co., 6 Cir., 172 F.2d 521, this court held that, under Ohio law, where a clear view of the railroad track could be had at a distance of 26½ feet from it, the failure of a driver of an automobile who was familiar with the crossing to look and listen for any approaching train before crossing was negligence; and since it was clear that the driver's attempt to make the crossing without stopping was the negligence which caused the accident, there was no contributory negligence on the part of the railroad; and a verdict of no cause of action was properly directed against the plaintiff, who had been a guest in the automobile and to whom no negligence was imputed. In Lacey v. New York Central Railroad Co., 1948, 85 N.E.2d 540, 541, the Court of Common Pleas of Montgomery County, Ohio, held that in order to raise the question of a railroad's negligence in failing to furnish additional safeguards at an extra-hazardous crossing, "Not only must the pleading contain the allegation of 'peculiarly hazardous,' but the facts which make it so much be pleaded"; and under the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, and West et al. v. American Telephone & Telegraph Co., 311 U.S. 223, 61 S.Ct. 179, 85 L. Ed. 139, we are constrained to follow such adjudication as the Ohio law here controlling on the subject. It is, moreover, to be said that the crossing in question was in open country, although it was within the limits of the village; and this fact differentiates the case from those referred to by appellant in which extra-hazardous crossings consisted of many tracks in closely built-up parts of metropolitan cities where a view of oncoming trains could not be had at a distance of more than six or eight feet from the crossings.

Under the foregoing authorities, we are of the opinion that the district court was not in error in refusing to submit to the jury as a question of fact whether appellee was guilty of negligence in maintaining a grade crossing of an extra-hazardous nature, without additional warnings or safeguards for the public.

We come, then, to appellant's contention that there was evidence to submit to the jury for its determination whether the railroad was guilty of contributory negligence because of the failure of the engineer to blow the whistle and ring the bell as required by law.[1]

The evidence relied upon by appellant to show negligence on the part of the railroad company in failing to cause the whistle to be blown and the bell to be rung when the locomotive was approaching the crossing is

1. Ohio General Code, Section 8853:
"Every company shall attach to each locomotive engine passing upon its road, a bell of the ordinary size in use on such engines, and a steam or compressed air whistle. When an engine in motion and approaching a turnpike, highway or town road crossing or private crossing where the view of such crossing is obstructed by embankment, trees, curve or other obstruction to view, upon the same line therewith, and in like manner where the road crosses any other traveled place, by bridge or otherwise, the engineer or person in charge thereof, shall sound such whistle at a distance of at least eighty and not further than one hundred rods from such crossing, and ring such bell continuously until the engine passes the crossing."

as follows: One witness for appellant testified: "I couldn't say I heard a whistle blown." When asked if she had heard a bell ring, just before the accident, she replied: "No, I didn't hear the bell ring." This witness was the driver of one of the cars proceeding toward the crossing which Proteau passed just before the collision. She had seen the smoke of the engine as it came down the track when she was 1,000 feet from the crossing. As she came to a stop, she watched the Proteau car speeding toward the tracks and stated that she was stunned because she thought: "I bet that man doesn't see the train." She was not asked whether she was listening to the bell of the locomotive just before the crash. Another witness for appellant was a boy who was thirteen years old at the time of the accident, and who was delivering papers along the highway that afternoon. When the Proteau car came by, overtaking the other two cars, the boy was at a point about 500 feet from the crossing. As he delivered a paper to the house at that location, he heard the whistle of the locomotive and knew that the train was approaching the crossing. He was asked whether, as Proteau turned to the left to pass the other cars, he had heard a whistle blown "at that time," and he answered: "No, it didn't." To the question, "Did a bell ring at that time?" he replied: "No." These questions were directed to an attempt to prove that although the whistle may have been blown before, it had not been blown within eighty rods of the crossing, as required by law. However, the boy testified that since he knew a train was coming toward the crossing and Proteau was driving toward it at such a high rate of speed, he expected a wreck and was, therefore, excited, and that after hearing the first whistle, he wasn't listening for any further whistle or ringing of the bell. On cross-examination, three years after the accident, he testified that he couldn't tell whether a whistle was blown after Proteau passed him because of his excitement in knowing that an accident was going to happen. Appellant Edna Clark, the girl who was injured in the wreck, was asked to explain what took place just before the accident, from the place

Proteau passed the other cars 500 feet from the crossing. Her testimony, upon which counsel for appellant so greatly relies, was that she was riding in the back seat of the automobile, talking to the other girls, when suddenly "this big black thing, the train, we were right on top of it." She was asked: "did a whistle blow at that time?" And she answered: "No, it didn't," and gave the same reply to a question whether a bell had rung at that time. On cross-examination, she was asked:

"Q. As you were down there by the Scholz driveway, (500 feet from the crossing) * * * did you know you were approaching a railroad crossing? * * * A. I wasn't paying any attention.

"Q. And there were three of you girls in the back seat * * *? A. Yes, there was.

Q. You three girls were talking? A. Yes, we were. We were talking.

"Q. So you weren't paying any attention until you saw the engine, is that right? A. I think so, yes.

"Q. So you weren't listening for any whistle or bell? A. I mean I wasn't talking. I think if there was a whistle I would have probably heard it. We weren't talking and laughing that loud. I could have heard it.

"Q. But you weren't listening for one? A. No, I wasn't.

"Q. You weren't looking for one? A. No, I wasn't.

"Q. And you didn't realize you were approaching a railroad crossing? A. No, sir.

"Q. That whistle could have sounded but due to the radio and you talking and not paying any attention and you not heard it, isn't that correct? A. Well, no, I think if it would have blown I would have heard it, because the radio wasn't playing that loud and we weren't talking and laughing that loud.

"Q. Edna, on the 20th of May, 1948, do you recall talking to one of the claim agents of the railroad company when

there was a court reporter * * * taking it down? A. Yes.

"Q. And to refresh your recollection, Edna, didn't he say this: 'You state you did not hear an engine whistle being sounded,' and didn't you answer: 'No, I didn't'? A. That's right.

"Q. You remember that, don't you? A. Yes.

"Q. And didn't he ask you: 'Could it have been sounded but you just didn't hear it due to the radio playing?' and didn't you answer: 'Yes.'? A. I don't know. I can't remember.

"Q. You can't remember whether that was true or not? A. I don't know."

 The foregoing constituted only negative testimony. The district court held that the only testimony in support of appellant's contention of negligence because of failure to blow the whistle and ring the bell was entirely negative in character, as contrasted to appellee's overwhelming evidence to the effect that the whistle was blown and the bell rung. No witness in support of appellant's claim testified that he was listening for any warning signals at any time prior to the accident. Where a witness testifies that warning signals were not given or that he did not hear such warning signals, and it appears that the witness was not listening to hear such signals or not paying attention as to whether they were given or not, such testimony is negative, and in the face of substantial uncontradicted testimony that the signals were given, the evidence is not sufficient to present to the jury the question as to whether such signals were given. Carter v. Pennsylvania Railroad Co., 6 Cir., 172 F.2d 521; Strider v. Pennsylvania Railroad Co., 6 Cir., 60 F.2d 237; The Continental Baking Co. v. Pennsylvania Railroad Co., 87 Ohio App. 505, 96 N.E.2d 258; Toledo & Indiana Railroad Co. v. Yhalkee, 51 Ohio App. 378, 1 N.E.2d 163. There was substantial uncontradicted testimony that the signals were given, as required by law. Under the authorities above cited, the evidence of claimed negligence on the part of appellee in failing to give the warning signals was not sufficient to take the case to the jury.

In accordance with the foregoing, the judgment of the district court is affirmed.