## SPIKINGS v. WABASH R. CO.
### No. 10605.

United States Court of Appeals
Seventh Circuit.

Jan. 7, 1953.

Elmer W. Freytag and John W. Costello, Chicago, Ill., for appellant.

James A. Dooley, Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and DUFFY and LINDLEY, Circuit Judges.

MAJOR, Chief Judge.

This appeal is from a judgment for personal injuries sustained by plaintiff as the result of a collision between a truck which he was driving and a train of the defendant railroad. The collision took place at the intersection of 83rd Place and the tracks of the defendant on the outskirts of the City of Chicago. The case was tried to a jury which rendered a verdict favorable to the plaintiff. Defendant's motion for a judgment notwithstanding the verdict was denied, also its motion in the alternative for a new trial.

Grounds urged for reversal are: (1) a failure of proof that plaintiff was in the exercise of due care and caution for his own safety at and immediately prior to the accident, (2) a failure to prove negligence on the part of defendant which proximately caused or contributed to the cause of the accident and (3) the giving of certain instructions tendered by plaintiff, asserted to be erroneous, and the refusal to give certain instructions tendered by defendant, asserted to be proper. A thorough study of the record leads us to the conclusion, for reasons subsequently disclosed, that the first issue must be decided adversely to plaintiff.

The collision took place at 5:30 p. m., February 6, 1948, when plaintiff's truck was struck by defendant's passenger train No. 10, known as the Banner Blue. The train was destined for Chicago and was traveling northeast. 83rd Place is a paved street approximately thirty feet wide, running east and west. Defendant's tracks run northeast and southwest and intersect 83rd Place at a 45-degree angle. There are three sets of tracks at the intersection; the westerly

is a switch, the middle is the main southbound and the easterly is the main northbound. 83rd Place about two hundred feet west of the railroad intersection merges with Southwest Highway, which also runs in a northeast and southwest direction. Something more than three hundred feet east of the point of collision, 83rd Place intersects the Grand Trunk Railroad tracks, which extend directly north and south and cross the Wabash tracks at Ashburn Station. The latter is located four hundred and twenty feet northeast of the point of collision. Southwest of the point of collision the first crossing is Lawndale Street, a distance of four hundred and forty feet, and the next crossing is 87th and Crawford Avenue, a distance of about one mile.

Defendant's tracks run straight and directly southwest for more than a mile from 83rd Place and are slightly elevated above the surrounding territory. The view of a traveler on 83rd Place from whichever direction he approaches the railroad intersection is unobstructed, and particularly is this so as he approaches from the west, the direction from which plaintiff approached. The territory between 83rd Place and the railroad contains no buildings or other obstructions; it is vacant land.

Twenty-three Wabash trains passed the intersection in question during the 24-hour period immediately prior to the accident, and approximately the same number of trains crossed said intersection at approximately the same hour each day for a period of thirty days prior thereto. A traffic count showed that an average of 363 vehicles and 111 pedestrians crossed the intersection daily. Some witnesses described the tracks as "pretty rough," but there is nothing to indicate that they were any different in that respect than the ordinary highway-railroad intersection. There were no street lights at the intersection and no gate flashers or watchmen. The crossing was protected only by the conventional cross-arm signals.

Plaintiff, 33 years old at the time of the accident, had been driving a truck about two and one-half years. At that time he was a salesman for the Coca Cola Company, and was driving a Chevrolet ton and a half

bottler's body truck, which was regularly assigned to him. The color of the truck body was yellow. As the driver, he sat in a somewhat elevated position, in contrast to the position occupied by the driver of a pleasure car. Plaintiff had lived within the vicinity of the scene of the accident for twenty-five years and was familiar with the layout of the tracks, the streets and the vicinity adjacent thereto. He had passed over this intersection many times before the accident and knew that fast trains were run in both directions.

As noted, the train involved was defendant's Banner Blue, one of its best passenger trains traveling from St. Louis to Chicago. The speed was variously estimated by the witnesses as between 55 and 75 miles an hour. Only one witness, a passenger, estimated it as high as "about 75 miles an hour." One witness expressed the opinion that the speed was 55 miles per hour, six others estimated it as 60 to 65 miles an hour. It was stipulated, however, that the train traveled from Chicago Ridge to Ashburn Station, a distance of 4.2 miles, in four minutes. It follows from this that its speed was 63 miles an hour. The train left Decatur, Illinois, nineteen minutes late and was seventeen minutes late at the time of the accident. Decatur is 173 miles from downtown Chicago. At or immediately before the collision the brakes were applied and the train stopped in less than half a mile, which was shown to be a good stop considering the size and speed of the train.

The facts so far related are without dispute. Plaintiff's argument in support of the judgment rests mainly, if not entirely, upon the premise that the train was traveling in the dark without a headlight, as is required by Illinois statute, Ch. 114, Ill.Rev. Stat. § 187. It is upon this premise that plaintiff attempts exoneration for failure to discover the approaching train in time to avoid the collision. It is true the witnesses described the situation relative to darkness or light in varying terms. It was described as being dark, light, a little bit light, a little bit dark, dusk, light enough to see, etc. The confusion results in some measure from the fact that some witnesses

were describing the situation at the time of the collision and others twenty-five or thirty minutes later. The weather on the date in question was clear and cold, the ground was covered with snow which had previously fallen, sunset was at 5:12 p. m., and the collision took place eighteen minutes later or at 5:30 p. m. It is obvious that darkness was rapidly approaching and that the situation relative thereto twenty or thirty minutes later was of little consequence. It is significant, however, that with the exception of the plaintiff, all occurrence witnesses, both those for the plaintiff and the defendant, testified that their visibility was sufficient for them to see the approaching train. Plaintiff urges, however, that the verdict of the jury "is conclusive upon the question of darkness." Assuming that such is the case, we fail to see how it is of any benefit to the plaintiff unless the train was traveling without the required headlight. It is a matter of common experience that an approaching train traveling in the dark with the required headlight is as readily discernible as one traveling in daylight.

We now come to the testimony of the witnesses, and first those offered by plaintiff. Recognizing the rule that plaintiff is entitled to have this testimony considered in the light most favorable to him, we have given it careful and thoughtful consideration. Plaintiff testified that as he approached the crossing, traveling east on 83rd Place, he stopped about ten feet west of the first rail of the switch track and talked to a boy. He then started up and stopped again within four or five feet of the first rail of the switch track. At that time he looked both ways and saw nothing coming. He said he could see about two hundred feet to the right and the same distance to the left. He again started up and, when just about at the first rail of the southbound track, he looked to his right and left but didn't see the train and didn't hear any noise at that time. As he got to the first rail of the third track (northbound), he heard a noise, looked out the right window and saw a black object which appeared to be a locomotive. When he heard the noise which caused him to look to his right, the front wheels of his truck were just over the first rail of the northbound track. Both of his windows were open about two inches to keep the frost off the windshield. He was asked by his own counsel, "Did you hear any whistle sounded at any time?" and he answered, "No sir, I did not," and also, "Did you see or observe any light on the black object?" and he answered, "No sir." Plaintiff also stated that as he proceeded toward the railroad tracks there were no vehicles either approaching or following, there was no noise from traffic and it was perfectly quiet out there. It might be added there was no other train at or near the crossing, either on the southbound main or on the switch track.

Elizabeth Raney, a witness for the plaintiff, testified that at the time of the accident she lived in an apartment building at 3534 West 83rd Place. This building was located two hundred feet east of the Grand Trunk tracks or something more than five hundred feet from the intersection where the accident occurred. She was in her apartment preparing dinner, and looking out the kitchen window had a clear, unobstructed view of 83rd Place west of the point of the accident. She saw a truck traveling east on 83rd Place when it was about half-way between the Southwest Highway and the railroad crossing. Thus, the truck was more than six hundred feet distant when first seen by her. At that time she observed that the truck was yellow. About half a minute later she looked again and saw that the locomotive had passed 83rd Place with a truck on the front of the engine. When asked by plaintiff's counsel, "Will you state whether or not the headlight was burning on the engine when you saw it pushing the cab along?" she answered "No, sir." Relying on this question and answer, plaintiff in his brief states, "This witness stated categorically, the headlight was not burning on the locomotive." It is obvious from the question that she stated no such thing and any doubt is removed by her further testimony that she was viewing the train from its side and could not state whether the engine headlight was burning. Mrs. Raney watched the train travel in the direction of

Chicago with part of the truck on the engine, past the intersection of the Wabash and the Grand Trunk tracks.

Dorothy Cerney lived in the same apartment building as Mrs. Raney and heard the crash. She immediately ran out into the street, and by that time the train was directly north of her. She was asked by plaintiff's counsel, "Now, before you heard the crash, Mrs. Cerney, did you hear any railroad train whistle?" and she answered, "Well, I couldn't say that I did," and she was asked, "As you looked north toward the train, did you observe whether there was a headlight burning on the train?" and she answered, "I didn't see any." Later she testified that she couldn't see that end of the train and, when asked on cross-examination, "You didn't know whether it whistled or not?" she answered, "That was what I said. I didn't know whether the train whistled or not."

Dorothy Schmidt, an 11-year old girl, lived in the same apartment building. She heard the crash and when she first saw the locomotive it was just at the Ashburn Station, with something on the front which she described as looking like a pile of junk. She was asked by plaintiff's counsel, "Did you see any light on the locomotive burning?" and she answered, "No."

Robert Ceman testified that he arrived at the scene of the accident a little before six o'clock and that the headlight on the engine was not burning. This is the only positive evidence in the record that the headlight was not burning, and that was at a time some twenty-five minutes after the collision.

Thomas H. Cooney, a police officer for the City of Chicago, testified that he arrived at the scene of the accident about 6 p. m. and admitted that at that time the headlight of the locomotive was burning.

Richard Matthews testified that he was riding on the train and that he did not hear any whistle before it crossed 83rd Place but that there was no occasion for him to listen for the whistle and that he did not know whether it was blown or not.

This is the sum and total of all the proof offered by the plaintiff bearing on the assertion that the engine was running without a headlight or that no whistle was blown for the crossing. It will be noted that there is no positive evidence even from the plaintiff himself in support of either assertion. The most that can be said is that the witnesses testified either that they saw no headlight or heard no whistle. Plaintiff by his own witness did establish that visibility was such that even the color of plaintiff's truck was discernible for a distance of more than six hundred feet, and that plaintiff's truck lodged on the front of the engine was discernible from a distance of three hundred to four hundred feet. However, if there be any inferences drawn from the testimony of plaintiff's witnesses favorable to the theory upon which the case is presented, they are completely obliterated by the positive, direct testimony of defendant's witnesses. It would unduly prolong our discussion to review their testimony in detail.

Two of the most striking witnesses offered by the defendant were William Niewold and V. O. Elkins. The former was ten years of age at the time of the accident. He had been to a store located east of the crossing on an errand for his mother and was returning home. As he walked across the Wabash tracks at 83rd Place, he saw the train three or four blocks away with its headlight on and heard the whistle blown before the train passed Lawndale, and it kept blowing until the train hit the truck. A little after he first saw the train, he also saw a truck coming east on 83rd Place. It slowed down near the tracks and, as it went across, it seemed to pick up speed. When the truck was about ten or fifteen feet from where the witness was standing, he pointed to the approaching train. The truck did not stop, he did not speak to the driver nor did the driver speak to him. (Evidently this was the boy whom plaintiff testified he stopped and talked to.)

Elkins testified that he had been employed by the Wabash Railroad as a telegrapher for ten years and was located at the Ashburn Station on the date of the accident, which is an interlocking and registering station. Passing Wabash trains throw off a register slip containing information regarding the train movement, which he enters

in the records of the office. This slip is usually thrown off the back end of a passenger train by a member of the crew. Prior to the accident he received notice that train No. 10 was approaching and set the interlocking controls. He then went out on the platform and saw the headlight of the train when it was about a mile away. He observed the Coca Cola truck when it was about one hundred feet from the northbound main. At that time the train was approximately fifteen hundred to sixteen hundred feet from the crossing. The whistle was being sounded at the time he first observed the truck and sounded continuously until the collision. The truck moved toward the crossing at a speed of about five miles per hour and continued to do so until it was struck by the train. The headlight was on at the time of the collision. He could plainly see automobiles on 87th Street, a distance of about a mile, waiting for the train to pass that crossing.

Clifford B. Ruthrauff had been employed by the Wabash Railroad as flagman in passenger service for forty-one years. He testified one of his duties was to throw off a train register slip at Ashburn, giving the number and other information with respect to the train. About the time the train passed Crawford Avenue, he went out on the rear platform to be in a position to throw off this register slip at Ashburn Station and was standing on the platform when the emergency brakes were applied. He heard the whistle for two crossings, one right after the other, and the whistle was sounded right up to the time the emergency brakes were applied.

J. W. O'Neil, locomotive fireman on train No. 10, testified the headlight was on and had been since the train left Decatur, Illinois, and that a rule of the Wabash required the headlight to be on at all times when a train is running, even in broad daylight. He testified that the whistle was sounded for Lawndale and from then continuously sounded to the point of collision. He observed the truck approaching the crossing, traveling about ten miles an hour. It slowed up for the switch track and the witness thought it was going to stop. When he saw it was not going to do so, he called

to the engineer who immediately applied the emergency brake. The whistle was blowing at the time of the collision.

F. A. Dely, the locomotive engineer, died before the trial. His deposition was introduced. He testified that the whistle was continuously blown from a point beyond Lawndale to 83rd Place and that the engine headlight was on. When the fireman called his attention to the approaching truck, he applied the brakes, a few seconds before the impact. After the train came to a stop he went to the front end of the engine and the headlight was on bright.

William Lanham, a postal transportation clerk, was working in the mail car on train No. 10 the afternoon of the accident. He picked up a mail bag from the crane at Oak Lawn, two miles south of Ashburn Station. As the train approached the place where the mail bag was to be picked up, he opened the door, looked forward and saw the headlight of the train shining on the bag. The whistle was sounded for the 83rd Place crossing.

Other witnesses who testified that the whistle was blown as the train approached the point of the collision and that they observed the headlight was on, either prior to the collision or when the train came to a stop, were Elwood Long, a porter on the train, Andrew Williams, a dining car waiter and John Thomas Daley, superintendent of motor power of the Alton and Southern Railroad, who was a passenger on the Wabash train. Also, Adam J. Madura, a Chicago police officer, testified that he arrived at the scene about five minutes before six, and the headlight was on at that time.

Plaintiff in his brief states:

"No defense was interposed as to the extra-hazardous conditions created by:

(a) the layout of the track, or;

(b) the heavy railroad traffic, or;

(c) the heavy automotive and pedestrian traffic."

This suggestion, if supported by the record, might have some bearing upon the question of defendant's negligence, that is, whether it failed to furnish proper protection at the crossing in the form of a watchman or warning signals, but it is not discernible, under the circumstances shown, how it could

have any relevancy to the question of plaintiff's negligence. As heretofore suggested, we find no proof that the crossing was other than the ordinary, conventional railroad crossing, and the amount of traffic, either railroad or automobile and pedestrian, bears no relation to the question. This is so because of the admitted fact that at the time of the accident there was no traffic of any kind at or near the crossing (except Niewold, the 10-year old boy who was on foot) to distract plaintiff's attention or to interfere with his discovery of the approaching train.

The parties in their briefs have come close to running the entire gamut of crossing cases. Plaintiff, in addition to those cited in his original brief, presents a supplemental brief in which many crossing cases from a score of jurisdictions are cited and discussed. No good purpose could be served in an attempted analysis of these many cases. After all, they do little more than emphasize what is already known, that is, that the result in each case depends in the main upon its own particular facts. There are, however, some general principles controlling in this jurisdiction, as well as all others so far as we are aware, which must be given effect.

In Allen v. Pennsylvania R. Co., 7 Cir., 120 F.2d 63, 64, this court held that it was incumbent on the plaintiff to prove that he was in the exercise of ordinary care for his own safety when approaching a railroad crossing, and in Soule v. Chicago & N. W. Ry. Co., 7 Cir., 175 F.2d 424, 426, we held that under the Illinois law the burden of proving freedom from contributory negligence rested upon the plaintiff. We perhaps could do no better than quote what was written by our late colleague, Judge Kerner, in the Allen case. He stated, 120 F.2d at page 64:

"In Illinois the rule has long been settled that it is the duty of persons about to cross a railroad track to look about them and see if there is danger, and not to go recklessly upon the track, but to take proper precaution to avoid accident. It is generally recognized that railroad crossings are dangerous

places, and one crossing the same must approach the track with the amount of care commensurate with the known danger, and when a traveler on a public highway fails to use ordinary precaution while driving over a railroad crossing, the general knowledge and experience of mankind condemns such conduct as negligence. Greenwald v. Baltimore & O. R. Co., 332 Ill. 627, 164 N.E. 142; see Theobald v. Chicago, M. & St. P. Ry. Co., 75 Ill.App. 208."

Many Illinois cases could be cited, but a few will suffice. In Moudy v. New York C. R. Co., 385 Ill. 446, 452, 53 N.E.2d 406, 408, the court stated:

"One who has an unobstructed view of the approaching train is not justified in closing his eyes in crossing a railroad track in reliance upon the presumption that a bell would be rung or a whistle sounded, and offering the presumption as an excuse for exercising care. Schlauder v. Chicago and Southern Traction Co., 253 Ill. 154, 97 N.E. 233; Greenwald v. Baltimore and Ohio Railroad Co., 332 Ill. 627, 164 N.E. 142. Likewise it is clear that if the view of the crossing is obscured, and the location of the crossing is known to the traveler, it is his duty to approach the crossing with the amount of care commensurate with the situation as it exists. The claim that care and caution by any person has been exercised cannot be sustained, when the known facts disclose that ordinary care would have avoided the accident."

In Grubb v. Illinois Terminal Co., 366 Ill. 330, 337, 8 N.E.2d 934, 938, the court stated:

"The law will not tolerate the absurdity of permitting one to testify that he looked and did not see, when, had he properly exercised his sight, he would have seen."

Similarly, in Carrell v. New York C. R. R. Co., 384 Ill. 599, 604, 52 N.E.2d 201, 204, the court stated:

"The law considers obnoxious a contention to the effect that a person looked but did not see a train when the view

498

was not obstructed, and where, if he had properly exercised his sight, he must have seen it."

██ We recognize that the question of plaintiff's contributory negligence, like that of defendant's negligence, is usually a question of fact and that the determination of the jury is conclusive. As this court stated in Surdyk v. Indiana Harbor Belt R. Co., 7 Cir., 148 F.2d 795, 797:

"And the question of contributory negligence is ordinarily one of fact for the jury, and only becomes one of law where the undisputed evidence establishes that the injury resulted from the negligence of the injured party. If there may be a difference of opinion on the question, so that reasonable minds will arrive at different conclusions, then it is a question of fact for the jury."

██ In our view, there could be no diversity of opinion among reasonable men but that plaintiff's negligence was the cause of the collision and his resultant damage. There is not a scintilla of positive evidence that the whistle was not blown and there is nothing more than the barest inference that the train was traveling in the dark without a headlight. As we have shown, the direct, positive evidence overwhelmingly demonstrates that such was not the fact. The only witness in a position to see the headlight and failed was the plaintiff, the one charged with the duty of looking for it. And there was no witness, other than plaintiff, who was listening and did not hear the whistle, and he did not testify it was not blown but only that he did not hear it.

Plaintiff makes a point, just to what purpose is not discernible, that we must take into consideration that the railroad crosses 83rd Place at an angle of 45-degrees, which means that the train was approaching mid-way between the right and the rear of plaintiff. We recognize that a train approaching under such circumstances might be deceptive to a stranger approaching the crossing, particularly in the dark, but it is of no aid to plaintiff because he was thoroughly familiar with the crossing and must have known the direction from which a train might approach.

Plaintiff suffered serious personal injury and it borders on the miraculous that he was not killed. It is not a pleasant duty to reverse the modest judgment which he obtained, but after giving the case the most careful study and thought of which we are capable we conclude that the law so requires. It follows that the court erred in its refusal to allow defendant's motion notwithstanding the verdict.

The cause is reversed and remanded, with directions that such motion be allowed.