Hilary L. WHEAT and Jessie C. Smith,
Plaintiffs-Appellants,

v.

The BALTIMORE AND OHIO RAILROAD COMPANY, a Corporation,
Defendant-Appellee.

No. 12378.

United States Court of Appeals
Seventh Circuit.

Jan. 12, 1959.

Robert L. Lansden, Cairo, Ill., John B. Mack, Memphis, Tenn., Charles C. Montgomery, Paris, Tenn., for appellant.

Edward W. Stubbs, Jr., East St. Louis, Ill., John C. Roberts, East St. Louis, Ill., on the brief (E. H. Burgess, Kenneth H. Ekin, Baltimore, Md., Kramer, Campbell, Costello & Wiechert, East St. Louis, Ill., of counsel), for appellee.

Before SCHNACKENBERG, PARKINSON and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

Plaintiffs, asserting their own freedom from contributory negligence, sued in tort to recover damages for personal injuries resulting from a railroad crossing accident in Geff, Illinois, on December 24, 1954, allegedly caused by the negligent operation of defendant's train.

The jury returned a verdict for plaintiffs.

Plaintiffs appealed the District Judge's grant of defendant's motion for judgment notwithstanding the verdict, further grant of defendant's motion for new trial (to be effective only in the event that the judgment be reversed), and denial of plaintiffs' later motion for judgment on the verdict, or, in the alternative, for a new trial.

Defendant contends that plaintiffs proved neither exercise of due care and caution for their own safety at and immediately prior to the accident, nor negligence of defendant which proximately caused or contributed to the cause of the accident.

We do not reach alleged errors on the part of the District Court with reference to instructions, because, as indicated below, careful scrutiny of the record dictates a conclusion that plaintiffs, as a matter of law, failed to show themselves in the exercise of the requisite due care and caution for their own safety.

Plaintiffs, residents and citizens of Weakley County, Tennessee, residing near Gleason, were employed by the Fisher Body Division of General Motors Corporation, at Willow Springs, Illinois, a suburb of Chicago.

As their testimony indicated, they arose about 3:30 or 4:00 o'clock A.M., December 23, 1954, worked till 10:00 o'clock P.M. that night, retired about 11:00 o'clock P.M., worked from 6:00 o'clock A.M. to 10:00 o'clock A.M. December 24, 1954, returned to their rooms at Summit, Illinois, about eight miles from Willow Springs, and by 11:00 o'clock A.M. started a 450 mile trip home to Gleason, Tennessee, in a 1940 Ford automobile owned by plaintiff Smith and driven solely by his son-in-law, plaintiff Wheat. Thus they had no more than six hours' sleep in the approximately 38 hours preceding the accident.

About 5:00 or 6:00 o'clock P.M. that night, they reached the small village of Geff, Illinois, about 250 to 275 miles from Summit, where defendant operated a train daily over a single track.

A collision occurred at the intersection of U. S. Highway 45 and the track,

near Geff. At the time of the impact the speed of the train was estimated at between 20 and 25 miles per hour, and that of the automobile at between 30 and 35 miles per hour.

The highway runs north and south: the railroad track runs in a generally northwesterly and southeasterly direction. Thus for a driver on the highway approaching the track from the north, there is a better view of any train going northwest, than would be available had this crossing been a right angle crossing.

In ascertaining the controlling question as to whether or not plaintiffs exercised due care for their own safety [1] it may be helpful to set out the testimony of the plaintiffs' witnesses touching this question.

In the following narrative summary, the actual expressions of the plaintiffs and their witnesses, the Pucketts, will be preserved insofar as possible.

Plaintiff Jessie C. Smith testified that the car, a 1940 Ford, belonged to him; that he had recently had the motor overhauled, put in new brakes and bought new tires. He had a driver's license, but his son-in-law, Hilary Wheat, did all the driving because he was the better driver and Smith had confidence in him and wanted him to drive.

They went south on U. S. Highway 45. The weather was cold, dry and reasonably clear. The car was equipped with a good windshield and made little noise. The windows were open an inch or two to avoid frosting.

Smith carried an unopened pint of whiskey purchased in Argo, Illinois, as a gift for his father. He, himself, does not drink. Wheat also bought a fifth as a gift for a friend. Neither had any alcoholic beverage that day. Smith had been over the highway two, three or four times both ways, usually after nightfall, but he wasn't familiar with it. He trav-

eled in the front seat and had been dozing, not sound asleep, because he was tired, until they were in Geff, about 200 to 300 yards from the track, just before the collision; he didn't know in what town he was, but knew he was on Highway 45. He didn't remember whether he saw a highway sign, yellow with a circle, crosses and the letters "RR". He knew what such signs meant and knew the principal signs, although he couldn't read. He didn't remember seeing a crossbuck sign, although he didn't say there was none there; he thought that if one were expecting it or looking for it one would see it, but he wasn't worried about those things, Wheat was driving. He didn't know a track was there and didn't look off to either side—just kept his eye on the road. He didn't see the train until he was right on the crossing, only the front wheels of the automobile were on the track. He saw the train just about the time it hit them. He heard no whistle (he would feel safe in saying it didn't blow) and no train bell. If there had been a whistle or bell, he was in position to hear it. He knows some train engines make quite a bit of noise, especially pulling uphill, but he heard none. His health then was good. He saw a car and its lights on the other side of the crossing, down the highway about 300 to 400 yards, coming north. He saw no light on the train, but wouldn't say there was no light.

Plaintiff, Hilary L. Wheat, testified that the Ford was in perfect condition—everything worked but the radio and heater; it was equipped with new tires and seal beam lights, giving good visibility. He did all the driving going about 60 to 65 miles per hour. When entering a town he would watch for speed signs. He had driven the highway about three times before, but was not familiar with it. He didn't recognize Geff by name, but was looking for speed

1. As federal jurisdiction in this case arises by virtue of diversity of citizenship, the law of Illinois is controlling. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. The law is well settled in Illinois that one cannot expose himself to a danger which he might have avoided through reasonable care for his own safety and then recover damages for resulting injury. Illinois Cent R. Co. v. Oswald, 1930, 338 Ill. 270, 170 N.E. 247.

limit signs; he saw one for a 30 mile zone and was driving within that. There were other signs but he was interested only in the signs that gave the speed limit and so forth. He didn't know he was approaching a railroad crossing. He had seen no railroad signs. It was after dark. He had the auto lights on. He recalls traffic from the other direction, all with lights. The first time he realized there was a train was about the time it hit them.

Prior to the collision he saw one auto approaching from the other side. As its lights blinded him, he dimmed his lights. He did not slow down or pull off. The only lights he saw were those on automobiles coming toward him. These caused him to pay more attention to the road, looking ahead through the windshield. He saw no light on the train. He couldn't say there was none.

He heard no train whistle, no bell. His window was open a bit and he thinks Mr. Smith's window was too. He also thinks the vent on his side was open, so he was in a position to hear any whistle or bell. For that model, the car operated very quietly. He could hear horns as he drove along the highway.

He was carrying home with him some clothing, anti-freeze, and an unopened fifth of whiskey, which he was taking home to Tennessee where it cannot be bought. He drinks once in a while, but did not on that day. His father-in-law, Mr. Smith, had an unopened pint of whiskey which he was taking home for his father. Mr. Smith would probably take a drink, but is not a drinking man. He watched the signs to be sure he stayed on the highway and within the speed limit. He saw a 30-mile sign when entering Geff and slowed down. He didn't see the "railroad crossing" sign but couldn't say it was not there. As he was going out of town he wouldn't definitely say he saw a sign "end 30-mile speed limit," but as a rule he would know that speed would pick up again as he left a town. He didn't increase speed because he was interrupted by the car facing him. He doesn't know how far away it was or whether it was stopped at the crossing. He doesn't know how far from the crossing he was then although on deposition he estimated it to be 75 yards. He was told his car broke off a railroad crossing sign, but he doesn't know.

He didn't look to the right or left along the track because he didn't know it was there. He didn't know what could be seen. It would depend on where one was when looking. He could stop at the speed he traveled in about 40 feet in his best judgment. The train would have to cross one lane of the highway traffic before it could be hit by the car he drove. It was already at the most easterly line of the highway before he saw it. He was right at the crossing. He saw it the instant it hit. He didn't know why he looked up then. It could have been the noise of the train, but it was not a train whistle. He wouldn't say there was no whistle. He heard none. He knows a steam locomotive has to make noise especially when going up hill, but he heard nothing. The train hit the left front of the car which was on the edge of the track, not across it. He didn't see the train because he had trouble with the lights of the oncoming car.

Mr. and Mrs. Puckett testified regarding bell and whistle signals.

On December 24, 1954, they were visiting the Walter Ellises, Mrs. Puckett's parents, who were then living in the first house on the east side of U. S. Highway 45, going north from its intersection with the B. & O. Railroad tracks, about 250 feet from the crossing. Next to the house, looking south, between the Ellis house and the tracks, is a used car garage, Rudesill Motor Sales, and south of that is John Spence's grain elevator, which is near the crossing. While they were sitting in the Ellis house eating, they heard no train whistle or bell. They thought they were in a position to hear such a bell or whistle. Traffic was heavy that night. They were in the dining room, in the center of the house, on the south side of it, with no room between them and the outer wall, behind double doors, with all doors and windows in the

house closed against the cold. There was a talking parakeet in the dining room to which they were all more or less listening. It was quiet, there were only the four adults and no children present. They wouldn't say the whistle didn't blow. They didn't hear it. Mrs. Puckett says that she wouldn't say it didn't—that was quite a while ago, but she didn't recall it, and she usually did hear train whistles.

■ To give probative force to negative testimony, it must appear that the witness was in such proximity that he could have heard the sound, and that his attitude of attention was such that if a bell or whistle had sounded it would have attracted his attention. Spikings v. Wabash R. Co., 7 Cir., 1953, 201 F.2d 492, certiorari denied 345 U.S. 992, 73 S.Ct. 1131, 97 L.Ed. 1400.

Although Mr. and Mrs. Puckett both testified that they were in a position to hear bell or whistle, the circumstances, as shown by their own evidence, negative that conclusion.

Plaintiffs' witness, Hunter Martin, Jr., registered in both Kentucky and Illinois as professional civil engineer and land surveyor, said that he had made a survey and plat of the scene of the collision. His testimony indicated the following: The track runs from southeast toward northwest. The Geff Seed and Grain Elevator, owned by John W. Spence, north of the railroad track, almost parallel thereto, and east of Highway 45, lies 92 feet from the crossing intersection. A spur track is south of it and runs parallel with the Elevator. The western end of the spur track is 25 feet from the east edge of the pavement of U. S. Highway 45, or 33 feet from the center of the Highway. The west end of the spur is 53 feet from the north rail of the main tracks, measuring perpendicularly from the railroad track to the end of the spur. He showed no other building along the spur track. Mr. Martin described other various landmarks which it is not necessary to detail here because they were at a considerable distance from the intersection, and this Court is of the opinion that landmarks played no part in the occurrence; this was a sparsely settled area, and the plaintiffs' own testimony is to the effect that they looked neither left nor right until the impact. Mr. Martin described a number of signs. Starting from the north, going toward the railroad track, on the right, at 930 feet from the intersection, was a sign reading: "Speed Limit, 30 Miles Per Hour," at 660 feet, a round sign, bearing a cross, and the letters "RR," and at 40 feet, a crossbuck railroad crossing sign. Mr. Martin testified that the tracks had a 1% grade at the intersection. He testified that at 150 feet there was nothing to obstruct the view down the highway. At 100 feet there was nothing to obstruct the view to the left but telephone poles. The closer to the track you got from 150 feet, the further down the railroad you could see as you looked to your left.

On the question of joint enterprise, Smith said that there was no arrangement for sharing expenses; that sometimes one paid and sometimes the other; that it wasn't right for one to do all the paying, as both were riding. They were going to their homes which were about 8 miles apart.

Smith testified that he owned the automobile, that he had a driver's license, that he traveled in the front seat; that he could have taken over the driving had he wanted to, and that he wanted Wheat to drive. Wheat said he didn't know whether Smith had a driver's license, but he would have let Smith drive had Smith wanted to—it was Smith's car. They had no understanding on sharing expenses, he said, though each paid for a part of the trip.

■■ It thus appeared that Wheat and Smith were engaged in a joint enterprise, and that Smith, the owner, riding in the front seat, had not abandoned control of the car. On the theory of principal and agent, he had the burden of proving his driver free of contributory negligence. Brooks v. Snyder, 1939, 302 Ill.App. 432, 24 N.E.2d 55; Grubb v. Illinois Terminal Co., 1937, 366 Ill. 330,

8 N.E.2d 934; Parrino v. Landon, 1956, 8 Ill.2d 468, 134 N.E.2d 311.

▮ Even were plaintiffs' own evidence less indicative of joint enterprise, and were Smith a mere passenger, he could not have omitted reasonable and prudent efforts on his part to avoid danger and still claim to have exercised due care for his own safety. Pienta v. Chicago City Ry. Co., 1918, 284 Ill. 246, 120 N.E. 1; Flynn v. Chicago City Ry. Co., 1911, 250 Ill. 460, 95 N.E. 449.

Plaintiff Smith, by his own evidence, looked at the highway, when he awoke, but did not look for any signs which might have warned him that he was approaching a railroad track, over which he had previously passed several times. Thus he looked neither to right nor left, and would have failed to see the train coming if it were visible. He also testified that he did not hear the steam engine until the moment of impact.

Plaintiffs' failure of proof appears plain to any reasonable view. However, should there seem to remain any question it is clearly answered by a brief examination of the pertinent testimony of defendant's witnesses. Spikings v. Wabash R. Co., supra. David L. McRoberts, locomotive engineer, and Thomas L. Pickett, locomotive fireman, both testified to lights on the train, sounding of bell and whistle. Raymond O. Piffer, head brakeman, and Vernon J. Harrell, flagman, both riding in the caboose, facing the rear of the train, couldn't testify to a light on the front of the train, but did testify to the continued sound of the whistle. William F. Bruce, conductor, also in the caboose, but facing forward, testified to both whistle and lights on the front of the train. All three in the caboose said they would not have heard the bell over the sound of the whistle.

If these B. & O. employees be discounted as possibly interested witnesses, there were eight other unquestionably disinterested witnesses who heard the whistles or saw the train light.

John W. Spence, owner of the grain elevator, left his place of business short-ly before the time of the accident. He crossed the tracks going south about ⅝ mile to his home, saw a train headlight coming through the woods about ¾ mile away; and later heard several whistles from about ½ mile away, which he continued to hear all the way home, the last being in short blasts.

Mack Atkinson, traveling north on U. S. Highway 45, saw the train coming when he looked to his right on approaching the crossing. He saw the headlight and heard the whistle. He traveled about 500 feet, stopped and waited for the train to pass. At about 240 feet, he saw the lights of plaintiffs' car coming south on the other side of the crossing. He heard the whistle at the time he first saw their car, which was about 1200 feet north of the crossing. The train was then between four and five hundred feet down the track. The plaintiffs' car did not slow down. He continued to hear the whistle and heard the chugging of the engine.

Smith must have seen Atkinson's car, as he testified that just prior to the collision he saw a car approaching from the south. Wheat, the driver, said that the headlights of this car tended to blind him.

It is clear that the two drivers saw each other approaching. One stopped in ample time. Yet Wheat continued, with apparently no lessening of speed until the moment of impact, although he testified that the lights of the approaching car tended to blind him, a circumstance which ought to have prompted a lessening of speed.

Plaintiffs argue that there were sharp conflicts in the evidence as to the presence of whistle, light, warnings, sufficiency of the warnings with reference to the hazards of the crossing, the relationship between the driver and owner of the car, and contributory negligence, and that all these issues were properly for the jury.

However, without consideration of the evidence adduced by defendant, relying solely on the negative evidence of the

plaintiffs, assuming that the train approached the crossing unlighted and without ringing bell or whistle, it still appears incredible that plaintiffs, in the exercise of reasonable care for their own safety, could be close enough to the train to collide with it, and yet not hear it, as they testified, although both admitted that a steam engine makes a lot of noise. Holt v. Illinois Central R. Co., 1943, 318 Ill.App. 436, 48 N.E.2d 446.

In Gibson v. Nenne, 1954, 2 Ill.App.2d 158, 118 N.E.2d 788, the Court said that if there were any evidence tending to show that an extra hazardous condition existed in the crossing, then it was for the jury to determine whether the railroad should have provided additional warning to travelers on the highway. However, here there was no proof of extra hazard to call for more than ordinary signals. This was a single set of track with an unobstructed view, in a very sparsely settled area, on the outskirts of a small town; only one train per day used the track.

Plaintiffs complained that their view would have been obstructed by freight cars on the spur track. However, their witness, Hunter Martin, described an unobstructed view for the last 100 feet, and Wheat testified that he could stop the automobile in 40 feet. Moreover, both plaintiffs testified that they did not look either to right or left.

The principles applicable here are well settled. Reasonable inferences may be drawn by a jury from established facts, and a verdict may not be set aside merely because the jury could have drawn different inferences from the evidence, but only where there is a complete absence of probative facts to support the conclusion drawn by the jury. Marquardt v. Cernocky, 1938, 18 Ill.App.2d 135, 151 N.E.2d 109; Lindroth v. Walgreen Co., 1950, 407 Ill. 121, 94 N.E.2d 847.

Considering all the evidence together with all reasonable inferences therefrom, in the light most favorable to the plaintiffs, there is not only a lack of evidence to prove plaintiffs free from contributory negligence, but on the basis of their own testimony, it appears that their own acts and omissions were the cause of the occurrence. Koch v. Chicago & N. W. Ry. Co., 7 Cir., 1953, 208 F.2d 152; Illinois Central R. Co. v. Oswald, supra. Nor can this Court see anything further on the part of the railroad that it possibly or conceivably could have done to avoid this accident.

As the District Judge said, the plaintiffs neither heard nor saw any of the warnings provided for their safety. They went blindly and deafly on, oblivious to the existence of a crossing or train. With the total absence here of showing due care and caution for their own safety, we can only be grateful that they escaped with their lives.

Judgment affirmed.