JEROME B. RAKERS, Admr. of the Estates of Robert and Roberta Rakers, Deceased, Plaintiff-Appellee, *v.* SOUTHERN RAILWAY COMPANY *et al.*, Defendants-Appellants.

(No. 70-31; 

Fifth District—November 27, 1972.

878

G. MORAN, P. J., dissenting.

David H. Bremer, of Roberts, Gundlach & Lee, of Belleville, and Chapman, Talbert & Chapman, of Granite City, (Morris B. Chapman and Norman H. Kinder, Jr., of counsel,) for appellants.

Listeman, Bandy & Hamilton, of Belleville, (Charles E. Hamilton, of counsel,) for appellee.

Mr. JUSTICE EBERSPACHER delivered the opinion of the court:

This action was brought by the plaintiff Jerome B. Rakers in his capacity as the Administrator of the Estates of Robert Rakers and Roberta Rakers, his deceased minor children. Robert Rakers was eight at the time of his death and Roberta Rakers was five years of age when she was killed. The action was brought for the alleged wrongful deaths of the two children. The plaintiff sought to recover damages against the Southern Railway Company for its negligent operation of a freight train and recovery was also sought from the Estate of Edmund Rakers, deceased, for willful and wanton misconduct in driving the truck in which the deceased children were riding as passengers at the time of their deaths.

The case was tried to a jury in the Circuit Court of St. Clair County which returned a verdict against both defendants awarding damages to the plaintiff in the amount of $30,000 for the death of Robert and a sum of $20,000 for the death of Roberta. The court entered judgment on the verdicts. From that judgment this appeal is brought by both defendants.

Robert and Roberta Rakers were killed shortly after 9:00 A.M. on July 18, 1966. At the same time, their uncle, Edmund Rakers, and his son were also killed in the same vehicle-train collision. Edmund Rakers, the driver, was the brother of Jerome Rakers, the father of the deceased Robert and Roberta. Jerome owned farmland which Edmund farmed as a tenant farmer. The deaths occurred when the farm truck in which the four were riding was struck by a Southern Railway Company engine on a crossing of the company's track and a rural road approximately one-half mile east of the Village of Posey, Clinton County, Illinois.

The day of the collision was clear, hot and dry; visibility was good.

On the morning of the tragedy, Edmund was driving his flat-bed farm truck and pulling a wagon trailer. The overall length of the truck and trailer combined was approximately 40 feet. Edmund had been hauling grain from the farm to the grain elevator in Carlyle, Illinois. Jerome was the operator-owner of the elevator. Earlier in the morning Edmund had brought two loads of grain to the elevator and at the time of the collision, Edmund and his passengers were returning to the farm for more

grain. The farm is located approximately one-half mile north of the crossing in question.

On the morning in question Jerome had seen his two children riding with Edmund and Edmund's son. Jerome had no objection to this. At the trial Jerome testified that to his knowledge Edmund's vision and hearing were normal. Jerome also testified that the truck in question had been owned by him and that he had sold it to Edmund some seven months before the collision. Jerome further testified that he had driven the truck on Saturday and Sunday before the collision (which occurred on Monday) and that the truck was in good mechanical condition and equipped with booster brakes that were also in good condition on the day before the collision.

The evidence indicates that as Edmund approached the said crossing, he was proceeding in an easterly direction on Illinois State Route No. 161. In the area of the crossing Route No. 161 lies approximately 75 feet south of and parallel to the railroad track. The crossing of the blacktop farm road is about one-half mile east of the Village of Posey. The farm road runs in a north-south direction and bisects the railroad track at a 90° angle. The railroad track and Route No. 161 run flat and straight for over a quarter of a mile west of the crossing. Photographs introduced into evidence show that a motorist proceeding in an easterly direction on Route No. 161 and then turning left or north onto the rural road has an unobstructed view in excess of ¼ mile to the west toward the Village of Posey. The unobstructed view includes the railroad track and any train that might be on the track. All ground in the area of the crossing is level. The crossing had cross-buck "railroad crossing" signs on the southeast and northwest corners.

Mr. Richard Brinkman, a farmer age 46, who had lived in the Carlyle area most of his life was the only witness to the collision. Mr. Brinkman was traveling in his one-ton truck in a westerly direction on Route No. 161. He stated he first observed the train when he was approximately 1400 feet east of the crossing. The train was coming toward him and was about 500 to 1000 feet west of the crossing when he first observed it, and its headlight was on. He estimated the speed of the train to be between 40 and 45 miles per hour. He first observed the truck as it was turning off of Route No. 161 onto the rural road. He estimated the speed of the truck to be approximately 5 to 10 m.p.h. He said the truck did not stop before continuing onto the tracks.

Mr. Brinkman testified that at the time of collision he was some 800 feet from the crossing. Mr. Brinkman was able to plainly see and observe without obstruction the events as they unfolded before him. He was driving with this truck windows open. He testified that he did not hear a

whistle blowing, although it may have been blowing and he might not have heard it because of the air noise of the wind. After seeing the collision Mr. Brinkman did not stop but continued driving west to the Village of Posey to telephone for an ambulance. He thereafter returned to the scene.

Mr. Eugene Twenhoeffel, age 44, testified that he had resided most of his life in the rural area surrounding the crossing. At the time of the collision he was visiting at his parents' home, which was located a half-mile east and a half-mile north of the crossing. Mr. Twenhoeffel farmed his parents' property and at the time of the collision, he was taking a break, having a drink of water with an employee in the yard of his parents' house. The first knowledge Mr. Twenhoeffel had of the collision was when he heard a loud noise or crash. He testified that he watched the train but didn't hear anything pertaining to the train before the crash. Mr. Twenhoeffel also stated that he was talking with his "hired hand" and didn't recall anything prior to the crash. He did admit that he didn't hear every whistle of every train that went by on the track in question.

Mr. George Roper, a farmer and retired Illinois Central Railroad employee, on the day of the collision resided on a farm which was situated approximately a quarter of a mile to the west of the crossing. Mr. Roper had an unobstructed view of the crossing from his house and yard. The house was located between Route No. 161 and the railroad tracks, the track being about 70 feet north of the house. As the trains pass they make a good deal of noise and a lot of vibration.

Shortly before the collision, while sitting on his front porch, Mr. Roper recalled observing the truck and wagon pass in front of his home. Next Mr. Roper became aware that a train was passing because it made a lot of noise and vibration. The speed of the train was estimated to be between 45 and 50 miles per hour. He stated he heard a "thump-like" noise and then he jumped into his car and went to the scene.

Concerning whether or not he heard a whistle or horn before the crash, Mr. Roper testified that he did not hear any before the impact of the collision. The question was asked "were you close enough you could have heard it if one had blown?" He responded "I could have heard it, but the train made so much noise I just don't think about it." His testimony was that he did not have a recollection one way or the other whether or not the whistle was or wasn't blown prior to the crash. Mr. Roper had lived in his home by the railroad tracks for 30 years.

The next to testify was Trooper Norman Detterman, a veteran of 12 years with the Illinois State Patrol. In July, 1966, his primary duty was the investigation of accidents and highway patrol. He arrived upon the scene about 9:20 to 9:25 the morning of the collision.

He stated that there had been a train-vehicle collision, that the four

occupants of the vehicle had been ejected, that the truck had been dragged three-tenths of a mile down the track while the box wagon had remained at the intersection. His testimony concluded with the identification of photographs of the scene and testimony of the measurements he had taken.

The plaintiff called as his witness Gerald Osman, age 29, the brakeman on the train. Mr. Osman stated that the freight train consisted of an engine, eight cars and a caboose. The train had left East St. Louis that morning eastbound. Osman further stated that Mr. Lawrence Wirtz was the engineer and he was located on the left, or north, side of the engine. Osman was serving in the capacity of brakeman and was seated on the right, or south, side of the engine. The conductor was Billy B. Gash, who was situated in the caboose approximately 500 feet to the rear of the engine. The flagman was Ronald L. Roberson, who had been seated in the front seat on the right, or south, side of the engine. Before the collision Roberson had left his position and had gone to the men's room, which is located at the rear of the engine cab, where he was at the time of the accident. The final crewmember was Mr. J. Nichols, the fireman, who was seated in the middle of the cab on a low seat (prior to and at the time of the accident).

On the date in question, Mr. Osman had been a brakeman with Southern for only a little over three weeks. He had made a couple of "cubbing Tricks" or training runs with a seasoned crew and a trainmaster in order to learn different tracks and proper procedures. In his capacity as brakeman, Mr. Osman was responsible for watching the train to the rear and front on the right, or south, side. When he was on the ground he was in charge of switches and tying hand brakes.

The engineer, located on the opposite side of Mr. Osman, had a blind spot to the right (south) and front (east) of the engine, as it proceeded in the easterly direction. As the train traveled through Posey, Mr. Osman was looking to the rear to check the train. The speed of the train was approximately 42 miles per hour. The weather was hot and dry. There was no obstruction of Osman's view to the south of the engine. Osman was in the position to view Route No. 161 as it paralleled the track, although he was not looking at the road.

Osman stated that when he first saw the truck, the train was about 200 feet west of the crossing. His testimony was "I—We were blowing for the crossing and I seen the vehicle upon the grade crossing and I got up and hollered at the engineer, because the noise was so bad in the cab I had to get out of my seat, and hollered real loud and told him to hold the whistle as a precautionary warning." There was no one on the train watching the south-forward view of the train from the Village of Posey

until 200 feet from the crossing. Mr. Osman, upon cross-examination, testified that there was a whistle post a quarter mile from the crossing and the air whistle on the engine had sounded. Two long, a short and long blasts were sounded. The engineer was on the last long whistle when the truck was first observed.

Mr. Osman did not tell the engineer to apply the brakes because he expected the truck to stop. The truck was moving very slowly when it came to the crossing. Mr. Osman estimated the speed at 2 to 3 miles per hour. After the crash, the engineer threw the emergency brake and the train came to a stop approximately three-tenths of a mile east of the crossing.

Conductor Gash testified that the engineer blew the whistle, two long blasts, one short and one final long blast. He testified that the whistle was blowing at the moment of the crash.

Finally, the engineer, Lawrence Wirtz, testified. He stated that he had served as an engineer with the railroad since 1945 and had been an employee since 1940. His testimony was that he started blowing the train's whistle at the "whistle post" and was blowing it when the train got to the crossing. He also testified that the train was traveling between 45 and 50 miles per hour and that he did not apply the brakes prior to the collision.

Both defendants have appealed from the judgment of the circuit court. We shall first consider the assertions of the defendant (Rakers) Steinmann, Administrator of the Estate of Edmund Rakers, deceased, hereinafter called the Estate. The administrator asserts that the court erred in the following particulars: That the Estate's decedent was not guilty of willful and wanton conduct as a matter of law and that the court erred in not granting the Estate's motion for a directed verdict at the close of the evidence.

■■ The Estate recognizes that it is the exceptional case wherein it can be said that the question of the willful and wanton misconduct on the part of the driver is not a question of fact for the jury. *Klatt v. Commonwealth Edison*, 55 Ill.App.2d 120, 204 N.E.2d 319, aff'd. in part, rev'd. in part, 33 Ill.2d 481, 211 N.E.2d 720.

■■ The Supreme Court has determined the type of evidence necessary to establish willful and wanton conduct under the Guest Statute. The case of *Clarke v. Storchak*, 384 Ill. 564, 52 N.E.2d 229, lists the necessary elements as proof "a) of any consciousness on the part of defendant that his conduct would naturally and probably result in injury; b) of any intentional disregard of a known duty; c) any absence of care for the life, person or property of others such as exhibited a conscious indifference to consequences."

■■ In considering the question of whether or not a verdict should be

directed or granted notwithstanding the verdict, we follow the Supreme Court's holding in *Pedrick v. Peoria and Eastern Ry Co.*, 37 Ill.2d 494, 229 N.E.2d 504, wherein the court states "In our judgment verdicts ought to be directed and judgment *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

A very lengthy statement of the facts of this case has been previously set forth. We do not feel that a further review of the evidence would serve any purposes here. There does not seem to be any conflict in the testimony except as concerns the blowing of the whistle which shall be discussed later in this opinion. There is a concensus that the weather was hot and clear, that the train was traveling about 45 miles per hour, the truck was traveling at approximately 5 miles per hour, that the ground was level and the views unobstructed, that the train was noisy, that the truck did not stop before entering the crossing. Now the question before this court is whether there is in the evidence such as would allow the jury, as finders of the fact, to find willful and wanton conduct by the Estate's decedent. But before we consider this, we shall comment on the Estate's assertion that the plaintiff made an admission which admits failure of proof of one of the elements required under the Guest Statute.

In discussing an instruction, plaintiff's counsel stated:

> "I object to Defendant Steinmann's Instruction Number 1 because it is an attempt to mislead the jury into thinking that Edmund Rakers had been guilty of some deliberate intention to injure these children who were riding as passengers. The reason that the instruction in I.P.I. brackets that material indicates that it may be given sometimes and should not be given at other times. *Here, I don't think there is any evidence at all that indicates wilful intention on the part of Edmund Rakers to injure his passengers.*"
> (A. 83) (Emphasis supplied.)

We shall not decide the effect of such a statement but shall assume arguendo that there is judicial admission that there is no evidence of "willful intention." The Guest Statute does not require intention. (*Schoenbacher v. Kadetsky*, 290 Ill.App. 28.) We do not believe in this case that there was any conscious intent to injure anyone. We do, however, believe that there is sufficient evidence for the jury to find that the Estate's decedent had an intentional disregard of a known duty. This could be either a duty to stop for the railroad track or to look when one is certain to see. There is also evidence for the jury to have determined that the Estate's decedent acted with an absence of care for the life of others with a conscious indifference to the consequences. The finding of

the jury may well have been based upon a combination of both the above stated elements. We cannot find that the Estate's decedent was not guilty of willful and wanton conduct as a matter of law.

The following quote from *Johnson v. Chicago & North Western Ry. Co.*, 9 Ill.App.2d 340, 132 N.E.2d 678, is pertinent even though the facts of the case are more harsh than the present case. In the *Johnson* case there were electric signals which were operating and the train applied its brakes when the car stopped frozen on the tracks. At pages 352-353 the court states:

> "* * * There are many cases in Illinois announcing the doctrine that a railroad crossing is known to be a dangerous place and that drivers approaching same must exercise care commensurate with the danger. What difference does it make in this case whether Mrs. Mullins, being familiar with the crossing and the danger involved, failed to discover the presence of the train from any of the warnings given her, although the view was unobstructed, or, whether having discovered the presence of the train from the warnings furnished her, she chose to ignore them and proceed across the crossing, nevertheless. If the former is the situation, does she have the right to refuse to look when the train is in plain sight, to refuse to listen to all the sound signals being given her, or refuse to observe the flasher? If it is the latter, does she have the right to ignore the warning signals and proceed across the crossing in the hope of beating the train? And having chosen to take the chance, will she now be permitted to plead that an error of judgment or a mishap in operation were not wilful because they were not intended? Appellant Fraser (Administrator of driver Mullins) says that both ill will and intentional injury are unbelievable in view of the relationship existing between the grandmother and the grandchild. It is clearly established in Illinois that neither intentional injury nor actual ill will is a requirement for wilful and wanton misconduct."

The defendant Southern Railway Company, hereinafter called the Railroad, has appealed urging that the court erred in denying the Railroad's motion for a directed verdict at the close of evidence. The Railroad has also other assertions of error which shall not be discussed at this point.

The plaintiff's complaint alleged that the Railroad "* * * failed and omitted in violation of Section 59, Chapter 114, Illinois Revised States, 1965, to ring a bell or sound whistle on said train at a point at least one-quarter mile west of said crossing and to keep same sounding until said crossing had been reached," and "* * * failed to use the

means then and there existing and available to stop said train when it knew or should have known of the approach of the truck in which plaintiff's decedents were passengers." The Railroad now asserts that there is not sufficient evidence to submit the issue to the jury. If we may paraphrase the Railroad's contention it is that the Railroad was not negligent as a matter of law under the facts herein.

Once again we note and follow the holding in *Pedrick v. Peoria and Eastern Ry. Co., supra,* in our consideration of the question of the appropriateness of a directed verdict or judgment notwithstanding the verdict. We must, therefore, examine the evidence in support of the above allegation. We shall first consider the assertion that there was a failure to sound a warning.

■■ We are instantly confronted by what is commonly known as the Negative Evidence Rule. In this cause we have three people testify that they did not hear the train blow a whistle or sound a horn. Mr. Brinkman, the witness to the collision, upon cross-examination admitted that it may have been blowing and he not have heard it (the whistle). He further admitted that it was possible that he might not have heard it if it had been blowing and he did not testify that he was paying any attention as to whether a whistle signal was given. Furthermore there is no evidence that he could have heard it under the circumstances. Mr. Twenhoeffel's testimony in regard to the whistle was also that he did not recall hearing a whistle blowing but that although he watched the train from a distance of one-half mile, his attention was not drawn to the train until he heard the crash of the collision. Finally Mr. Roper, who lived just south of the tracks and had so lived for 30 years, stated he didn't hear any whistle but that he didn't pay attention to the noise. He also indicated that his attention was first directed to the crash when he heard a "thump-like" noise.

In contrast to the above three witnesses' testimony, there were three witnesses who testified affirmatively that the whistle did sound. The engineer who was actually operating the whistle, the conductor located some 500 feet at the rear of the train and the brakeman Osman, called as a witness by plaintiff, who not only testified that the whistle was blowing but that he instructed the engineer to continue blowing the whistle.

In *Berg v. New York Central R.R. Co.,* 391 Ill. 52 @60, 62 N.E.2d 676, our Supreme Court said:

"It is well settled that negative evidence is admissible where the attending circumstances are such as to show it has some probative force. [Citing cases.] It is obvious that if a witness, without explanation of his evidence, testified that he did not hear a bell or whistle, such testimony would have no value. To give it probative

force it must appear that the witness was in such proximity that he could have heard the sound had it been given, and that his attitude of attention was such that if the bell or whistle had sounded it would have attracted his attention."

The rule has been similarly stated in *Merchants Natl. Bk. of Aurora v. Elgin, Joliet & Eastern Ry. Co.*, 121 Ill.App.2d 445, 257 N.E.2d 216, at page 224. The determination must be made on that rule of law as applied to the facts of the present case. We cannot but conclude that there was not sufficient evidence to submit the issue to the jury. As stated in *Clark v. Baltimore and Ohio R.R. Co.* (6th Cir. 1952), 196 F.2d 206:

"Where a witness testifies that warning signals were not given or that he did not hear such warning signals, and it appears that the witness was not listening *to hear* such signals or not paying attention as to whether they were given or not, such testimony is negative, and in the face of substantial, uncontradicted testimony that the signals were given the evidence is not sufficient to present to the jury the question as to whether such signals were given." (Emphasis supplied.)

In accord is *Wheat v. Baltimore and Ohio R.R. Co.* (7th Cir. 1959), 262 F.2d 289, where the court states:

"To give probative force to negative testimony, it must appear that the witness was in such proximity that he could have heard the sound and that his attitude of attention was such that if a bell or whistle had sounded, it would have attracted his attention. *Spikings v. Wabash Ry. Co., 7th Cir. 1953, 201 F.2d 492, Certiorari denied, 345 U.S. 992, 73 S.Ct. 1131, 97 L.Ed. 1400.*"

See also *Gamer v. Elgin, Joliet & Eastern R.R. Co.*, 99 Ill.App.2d 119, 240 N.E.2d 712.

■■■ Concerning the plaintiff's second allegation that the Railroad failed to stop the train, we have thoroughly reviewed the evidence and find that there is no testimony to indicate that there was any immediate danger of collision. The truck was proceeding slowly towards the railroad track and the track was marked with all views unobstructed. There was also a duty for the truck to stop. The plaintiff asserts that brakeman Osman's warning to the engineer to "hold the whistle" was recognition that the truck was not stopping and that failure to exercise stopping measures was negligence for the jury to consider. We cannot so consider that testimony. Osman stated that he told the engineer as a precaution. The vehicle was not on the track and was only heading in the direction of the tracks at a slow rate of speed. The law of this State does not require that a train exercise stopping measures when it sights another vehicle approaching an intersection. The train is allowed to assume that

the approaching vehicle will act in a prudent manner at a railroad crossing. The train is thus allowed to presume that the vehicle will yield the right of way until such time as it becomes apparent that the vehicle has not heard or will not heed the signal. *Robertson v. New York Central Ry. Co.*, 388 Ill. 580, 58 N.E.2d 527. See also *Carrell v. New York Central Ry Co.*, 384 Ill. 599, 52 N.E.2d 201; I.P.I. No. 73.01 and the cases cited thereunder.

We, for the above-stated reasons, must conclude that under the law of *Pedrick v. Peoria and Eastern Ry. Co., supra,* that there is no evidence in this case to allow the verdict to stand against the Railroad. The matter should not have been submitted to the jury and the trial court erred in failing to grant the Railroad's motion for a directed verdict at the close of the evidence.

The judgment against the defendant Estate is affirmed. The judgment against the defendant Railroad is reversed.

JONES, J., concurs.

Mr. PRESIDING JUSTICE GEORGE J. MORAN dissenting:

I do not agree that the judgment in favor of the plaintiff and against the Southern Railway Company should be reversed.

The witness Brinkman was only 800 feet from the accident when it happened. His attention had been focused on both the train and the truck for some time prior to that. The windows of his truck were open and his attitude of attention was such that if a bell or whistle had sounded, he would surely have heard it. His statement that it was possible that the whistle was blowing but that he may not have heard it is but the statement of an honest person who would not be absolute in anything that he could not be sure of. In my opinion, his testimony has probative value under the rationale of *Berg v. New York Central R.R. Co.*, 391 Ill. 52, 62 N.E.2d 676, and *Merchants Nat. Bank of Aurora v. Elgin, Joliet & Eastern Ry. Co.*, 121 Ill.App.2d 445, 257 N.E.2d 216.

Since I conclude that the testimony of Richard Brinkman was sufficient to raise an issue of fact on the question of whether or not the defendant, Southern Railway, sounded a whistle or bell as required by statute, I therefore dissent from that portion of the majority opinion reversing plaintiff's judgment against Southern Railway Company.