**Stephen E. BEBOUT, Stephen Bebout, and Jon P. Bebout, Plaintiffs–Appellants,**

v.

**NORFOLK & WESTERN RAILWAY COMPANY, Defendant–Appellee.**

No. 91–2408.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 23, 1992.

Decided Jan. 8, 1993.

Rehearing Denied March 3, 1993.

Joseph L. Bauer, Jr., Schlichter Law Associates, Fairview Heights, IL, Drew C. Baebler (argued), Schlichter Law Associates, St. Louis, MO, for plaintiffs-appellants.

John E. Fick (argued), Samuels, Miller, Schroeder, Jackson & Sly, Decatur, IL, for defendant-appellee.

Before COFFEY, FLAUM, and RIPPLE, Circuit Judges.

PER CURIAM.

As dusk settled on the sixth of April, 1986, Stephen E. Bebout, driving with his brother Jon, turned east onto Route 9 outside of Gibson City, Illinois. As they went

over a railroad crossing several hundred yards down the road, a Norfolk & Western freight train heading north collided with Stephen's car.

Stephen, testing recently installed shock absorbers, was travelling at approximately 20 miles per hour at the moment of impact. Although no obstructions cluttered the railroad tracks at this intersection, he did not see either the flashing lights of the crossing post or the headlights on the approaching train, nor did he hear a warning whistle from the train prior to its entering the crossing. The force of the forty-mile-an-hour freight train crumpled the back of the passenger side door, pitched the vehicle over the adjacent flasher post, and propelled Jon through the windshield of the car. Stephen suffered numerous contusions and abrasions as well as a broken wrist in the accident. Jon continues to suffer from post-traumatic amnesia as a result of a closed-head injury he sustained.

In a suit filed on April 5, 1988, the Bebouts' alleged that Norfolk & Western was negligent in failing to provide adequate warning: the railroad crossing lights were not flashing, the freight train's headlights were not illuminated, and the warning whistle did not blow. Additionally, the plaintiffs-appellants asserted that the train crew failed to brake the train when they knew or should have known that Stephen's car was going to enter the crossing. Norfolk & Western counterclaimed against Bebout for property damage to its equipment and for overtime pay to its employees delayed by the wreck.

A jury trial began on June 3, 1991. At the close of plaintiffs' evidence, the defendant-appellee moved for a directed verdict. Prior to ruling on the motion, the district court required the defendant-appellee to make an offer of proof of three non-employee witnesses outside the presence of the jury. Reassured that the railroad company had not been negligent in any of the

instances raised by the Bebouts, the district court granted Norfolk & Western's motion.

## I.

Under Illinois law, directed verdicts are appropriate "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & E.R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504, 514 (1967); see *Davis v. FMC Corp.*, 771 F.2d 224, 229 (7th Cir.1985). Because the case was brought under the diversity jurisdiction, the state law standard of review governs. *Hayes v. Otis Elevator Co.*, 946 F.2d 1272, 1275 (7th Cir.1991). This court reviews the district court's determination *de novo*.

Of the four issues raised by the plaintiff-appellants, only one merits more than a passing reference. The district court was correct in its assessment of the evidence with respect to the operation of the crossing lights, the train headlights, and the automatic brake because the evidence in these instances did overwhelmingly favor the defendant-appellees. The testimony with respect to the sounding of the train's warning whistle, however, gives us pause.[1]

At trial, three railroad employees testified that the train indeed blew its whistle. Three other witnesses—Stephen Bebout, Dorothy Varboncoeur, and Jerry Tomes—testified that they did not hear the whistle prior to the collision. In evaluating the testimony offered by the second group, this court grapples with the "negative evidence rule," employed by Illinois courts to limit the capacity of negative evidence to create a triable issue of fact. In the present case, negative evidence is sufficient only if the witnesses so offering (1) were

---

1. Although the district court did not enter a formal judgment, the absence of a Rule 58 judgment does not bar this court from asserting jurisdiction. *First National Bank of Chicago v. Comptroller*, 956 F.2d 1360, 1363 (7th Cir.1992). Moreover, the judgment of the district court was final despite the absence of a definitive ruling on Norfolk & Western's counterclaim because it has waived this counterclaim by failing to pursue it at the trial level. Thus, this court has jurisdiction pursuant to 28 U.S.C. § 1291.

close enough to hear a whistle, and (2) were paying enough attention that they would have heard the whistle had it been blown. *Berg v. New York City R.R. Co.,* 391 Ill. 52, 62 N.E.2d 676, 680 (1945); *Rakers v. Southern Ry. Co.,* 8 Ill.App.3d 877, 290 N.E.2d 421, 428 (1972).

Application of this rule in the Illinois appellate courts has not been entirely consistent. In *Rakers* three witnesses testified that they did not hear a whistle prior to the accident in question. One of those witnesses observed the accident from approximately 800 feet away while driving his car towards the crossing; the other two witnesses were in houses one-quarter mile and one-half mile from the crossing, respectively. *Rakers,* 290 N.E.2d at 423–24. The court, over a dissent, held that these individuals were not of the mindset to notice a train whistle had one been sounded, and hence overturned a jury verdict entered in favor of the plaintiff. *Id.* at 427–28. *Knott v. Chicago & Eastern Illinois R.R. Co.,* 73 Ill.App.3d 707, 29 Ill.Dec. 760, 392 N.E.2d 317 (1979), decided about seven years later, presents a nearly identical situation. Three witnesses testified that they did not hear a train whistle prior to the collision. None were in their cars at the time, all were in buildings approximately 150–200 feet from the crossing. Railroad employees testified that the train had sounded its whistle. That court-over a dissent which echoed the rationale in *Rakers*—held that the negative evidence offered by the plaintiffs' witnesses was sufficient to create a question of fact for the jury, and reversed the directed verdict entered by the trial court in favor of the railroad. *Id.* 29 Ill.Dec. at 762–64, 392 N.E.2d at 319–21.

A complete reconciliation of *Rakers* and *Knott* would test the limits of credulity. In fact, one could make a good argument that *both* cases were incorrectly decided, for the plaintiff in *Rakers* brought forward a witness who observed the accident from the road, while the plaintiff in *Knott* did not. *See Knott,* 29 Ill.Dec. at 764–65, 392 N.E.2d at 321–22 (Jones, J., dissenting); *Rakers,* 290 N.E.2d at 429 (Moran, P.J., dissenting). Because *Knott* arrived seven years after *Rakers,* perhaps it signals a conscious decision by the Illinois courts to weaken the negative evidence rule.

■ In any event, this tension should not affect the outcome in the case *sub judice,* for Stephen Bebout's testimony was sufficient to withstand a directed verdict under either the *Rakers* or the *Knott* version of the rule. Because Bebout was close enough to hear the train's whistle, Bebout's not seeing the flashing lights as he approached the crossing may suggest that his "attitude of attention" was such that the whistle was not likely to get his attention. Such a conclusion, however, invades the province of the jury. Bebout's failure to notice the flashing lights at the crossing, particularly when driving eastward at dusk, does not lead inexorably to the conclusion that he was paying insufficient attention to hear a whistle. Vision and hearing are separate senses, and the latter is often more precise than the former. First-base umpires call close plays not by watching the ball, but rather by listening for the thud it makes when hitting the first baseman's glove. Although it is difficult to know for sure, one suspects that Illinois courts impose a duty on railroads to signal their approach with lights *and* whistles out of recognition that targeting two senses is better than targeting one. Bebout's testimony that he downshifted prior to crossing railroad tracks and looked both way could create a reasonable inference that he had a sufficient "attitude of attention." Bebout had every reason not to tell the truth, but only the jury can judge the credibility of witnesses and resolve evidentiary conflicts. *Dowler v. New York, Chicago & St. Louis R.R. Co.,* 5 Ill.2d 125, 125 N.E.2d 41, 45 (1955).

Accordingly, this case is AFFIRMED in part, REVERSED in part and REMANDED for a trial on whether the train sounded its warning whistle when approaching the crossing.

COFFEY, Circuit Judge, concurring in part, dissenting in part.

Stephen Bebout, Jr. and Stephen Bebout, Sr., individually and as father and next

friend of Jon Bebout, appeal the district court's granting of Norfolk & Western Railway Company's ("Norfolk") directed verdict motion at the close of the plaintiffs' case. The district court stated: "if I let the case to go the jury and they found against the railroad, I have to tell you I would set it aside. I would have to set it aside because I find no basis for negligence in the operation of the train or maintenance of the signal equipment that was a proximate cause of the occurrence." The appellants assert that the trial judge made improper credibility judgments and misapplied Illinois law in holding "that the railroad wasn't negligent and that the railroad's conduct wasn't the cause, nothing the railroad did was the cause of the collision." The majority has ruled that the trial court properly granted a directed verdict on the issues of whether the train should have employed its emergency brake, whether the railroad crossing lights were flashing and whether the train was traveling too fast. I dissent from only that part of the majority's opinion holding that a triable issue of fact exists as to whether the train sounded its warning whistle.[1]

## I. FACTS

About 6:45 or 7:00 p.m. on April 6, 1986, sixteen-year-old Stephen Bebout, Jr. made a left-hand turn eastbound onto Route 9 a block or two west of Norfolk's railroad crossing near Gibson City, Illinois. Because he and his younger brother, Jon, a passenger in the front seat, were testing repairs they had made to the air shocks on the car just minutes earlier, Stephen accelerated to 25 mph. In approaching the railroad tracks, Stephen shifted to second gear and proceeded to cross the tracks at about 20 mph. It was dusk, and even though Stephen had an unobstructed view of at least one-quarter of a mile of the railroad track, he failed to see or hear the rumbling mile and one-half long oncoming train much less observe any of the three warn-

ing signals (the flashing signal lights at the crossing, the beamed headlight on the approaching train or the train's warning whistle prior to entering the railroad crossing). When the automobile was approximately two-thirds of the way across the tracks, the Norfolk freight train traveling northbound at 40 mph struck the vehicle on the passenger side. The impact hurled the car over the flasher post on the east side of the crossing and the force of the impact catapulted Jon through the windshield. Jon received a closed-head injury resulting in post-traumatic amnesia and is unable to recall anything prior to one to two months after the accident; Stephen suffered a tearing of the ligaments and tendons in his right shoulder as well as a fractured left wrist.

The case went to trial before a jury on June 3, 1991. At the close of the plaintiffs' evidence, the defendant moved for a directed verdict, and the trial judge granted the defendant's motion stating:

"If I let the case go to conclusion and without regard to what the defendant would bring in, and I can't imagine the defendant's going to bring witnesses that will do anything but buttress up the railroad's position, but if I let the case go to the jury and they found against the railroad, I have to tell you I would set it aside. I would have to set it aside because I find no basis for negligence in the operation of the train or maintenance of the signal equipment that was a proximate cause of the occurrence."

Prior to releasing the jury, the trial court directed the defendant to make an offer of proof out of the presence of the jury of three non-employee witnesses who were at a nearby gas station at the time of the accident in order "to reassure myself that there isn't something—that there isn't something hidden in that case that I wasn't aware of or that the plaintiff wouldn't be aware of." After the hearing the defendant's offer of proof,[2] the judge called the

---

**1.** The testimony at trial refers to the train's "whistle" and "horn" interchangeably, we refer to it only as the whistle.

**2.** After deciding to grant the directed verdict motion, the judge heard from three other potential defense witnesses who were standing in a gas station parking lot a block and a half east of

jury back in and advised them that he was taking the case away from them. He explained to the jury that his decision, based upon the plaintiffs' evidence, was "that any verdict against the railroad on the questions of negligence or proximate cause could not stand."

## II. DISCUSSION

In reviewing a district court's grant or denial of a motion for a directed verdict in a diversity case, the state's standard of review is applied. *Cincinnati Ins. Co. v. City of Taylorville*, 818 F.2d 1345, 1348 (7th Cir.1987). In Illinois, "verdicts ought to be directed ... only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & E.R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504, 513–14 (1967). The Illinois rule does not require that there be a complete lack of evidence in favor of the opponent of the motion, as "the presence of *some* evidence of a fact which, when viewed alone may seem substantial, does not always, when viewed in the context of all of the evidence, retain such significance." *Id.* 229 N.E.2d at 510 (emphasis original). Thus, it may be permissible for the trial court to resolve some factual disputes in granting a motion for a directed verdict, "for the right to a jury trial includes the right to a jury verdict *only if there are factual disputes of some substance.*" *Id.* (emphasis added).

I will examine only the evidence or lack thereof concerning whether the train whistle sounded since I agree with the majority's holding that there was no negligence on the part of the railroad as to the speed of the train, the emergency brake, and the flashing lights. In cases of this nature it is essential to remember the duties of the

respective parties under Illinois law. The train has the right of way at a crossing and has a duty to warn motorists of its approach. The motorist has a duty to exercise due care and not enter the railroad crossing when a train is approaching. *See, e.g., Robertson v. New York Central R.R. Co.*, 388 Ill. 580, 58 N.E.2d 527, 529 (1944). The plaintiffs argue that the trial judge's determination that the train sounded its whistle was an inappropriate credibility judgment because there was sufficient evidence to present a question of fact for the jury on both issues. In reviewing the record to ascertain whether there was an issue that should have been submitted to the jury, we must be mindful of the United States Supreme Court's admonition that *"there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (emphasis added).

> *"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict— 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'"

*Id.* at 252, 106 S.Ct. at 2512 (citation omitted) (emphasis added).

The appellants argue that the issue of whether the train's whistle was blowing should have been submitted to the jury because in their view there was substantial evidence that the trainmen failed to blow

---

the train crossing. The first witness, Robert Zambreno, testified that "we heard the [train whistle] blowing and blowing and blowing." Tr. at 356. The second parking lot witness, James Craig, testified that "he [the conductor] was blowing his whistle so steadily that it

seemed—seemed something was wrong and then we heard this crash." Tr. at 365. Finally, the third witness in the parking lot, Thomas Joseph Zambreno testified that "he was blowing the usual crossing, which is two longs, a short

the whistle.[3] The plaintiffs' complaint and brief rely on the testimony of Stephen Bebout, Dorothy Varboncoeur and Jerry Tomes while the majority bases its opinion only on the testimony of Stephen Bebout. Let us examine if in fact this evidence is sufficient to create a triable issue of fact. Stephen Bebout, the driver of the car, testified that he *did not hear* a whistle; Dorothy Varboncoeur, who was visiting with her friend in her friend's apartment near the railroad crossing, testified that although she heard the crash, she *did not hear* a whistle prior thereto; Stephen Bebout's brother-in-law, Jerry Tomes, who lived one-half block from the railroad track, testified that he can usually hear the train whistle from his trailer but *did not hear* it that evening.[4] In contrast to the evidence of the witnesses who testified that they did not hear the whistle, three of the railroad employees testified that the whistle was blowing. In fact, the front brakeman testified that when he observed the approach of the Bebout vehicle he attempted to blow short blasts of the whistle in hope of attracting the driver's attention, but was unable to activate the whistle for it was already operative with the engineer's blowing of a constant blast.[5] The plaintiffs contend that the testimony of Bebout, Varboncoeur, and Tomes who did not hear the whistle blowing was substantial evidence requiring the jury to determine the issue; I disagree, for the Illinois law is very clear:

> "To give [negative evidence] probative force, it must appear that the witness was in such proximity that he could have heard the sound had it been given, and that *his attitude of attention was such that if the bell or whistle had sounded it would have attracted his attentions.*"

*Rakers v. Southern Ry. Co.*, 8 Ill.App.3d 877, 290 N.E.2d 421, 428 (1972) (quoting *Berg v. New York C.R.R.*, 391 Ill. 52, 62 N.E.2d 676, 680 (1945)) (emphasis added).

There is no question that Stephen was in near proximity to the train and thus in a position to hear the whistle (even with the car windows allegedly closed on a balmy (70°) spring evening). His failure to see or hear the mile and one-half long freight train itself, the train whistle, the flashing signal lights, or the headlight on the engine of the train with a one-quarter-mile unobstructed view as he approached the crossing makes it apparent that he did *not* have the "attitude of attention" that would have attracted his attention to the whistle for him to be aware of it. The district judge obviously discounted Bebout's testimony (that he did not see the train or the warning lights or hear the whistle) in light of the overwhelming evidence to the contrary. In reality, Bebout was not aware of anything. Dorothy Varboncoeur was likewise close enough to the crossing to hear the whistle, but the record is barren of any evidence that she was listening for it. In fact, she was visiting in an apartment with another person at the time of the crash, and only after hearing the collision did she and her companion become aware of the train and run outside to observe the accident scene. Although she testified that she did not hear the whistle, what impressed her most was that "after we heard the crash, we never heard the bell, never heard the whistle. That was so strange because you can hear them bells when the things are coming down." Ms. Varboncoeur was obviously confused about the details of the event, as she falsely testified that the railroad crossing had gates and bells, when, in fact, it is equipped with

---

and a long, and stayed on the whistle, though, towards the end." Tr. at 371.

3. The appellants further assert that the railroad was negligent in failing to sound the whistle in short, choppy blasts. But they have failed to establish that there is a duty for the railroad to sound the whistle in that fashion, and, in the absence of a duty, there is no negligence.

4. Mary Litchfield, who was following the Bebout vehicle some distance to the rear (she was unable to specify how far) did not remember whether she heard a whistle from the train. Since Ms. Litchfield did not recall whether she heard the whistle, her testimony was of no probative value.

5. The fourth crew member of the train, the rear brakeman, testified that although he believed the whistle was blowing, he was unable to specifically recall. This testimony, like that of Mary Litchfield, was also of no probative value.

neither and has nothing but a flashing light. Transcript at 161, 164. The district judge stated that he discounted her testimony for "[it] could not support a reasonable finding that the whistle wasn't being blown." Transcript at 347. Finally, Jerry Tomes, the plaintiff's brother-in-law, who was also close enough to hear the whistle testified that although he heard the train, he heard neither the crash nor the whistle and obviously he lacked the required attitude or degree of attention. He further stated that after living near the railroad for about a year, *he no longer paid much attention to the train whistles.* The judge also discounted his testimony, "I don't see how reasonable people could put any reliance on what Jerry Tomes said . . ." *id.,* for Tomes made it quite clear that after living near the tracks for a year he no longer pays any attention to the trains.

The majority excuses Bebout's failure to see the flashing lights because he was "driving eastward at dusk." Maj. at 5. Rather than excusing him, this change in illumination and visual eye accommodation condemns him. It is a known fact that when the sun sets in the west and a person is driving east away from the sunset, the sky in front of him is darker which would make the flashing lights more visible to the human eye not less visible. Bebout testified:

> "I believe it was starting to get dark, you know, dusk, just about right around there. The sun had already set, I believe, and it was down so it was—you know, *it was getting onto dark.*"

Transcript at 251 (emphasis added). When it is "getting onto dark" and the sun has already set in the west behind the driver as he drives east into darkness, the flashing lights can be more readily seen because of the sharp contrast due to the change in illumination as a result of the human's visual eye accommodation. This comports with Mary Litchfield's testimony (an independent witness), who was driving right behind Bebout and stated that the flashing lights were quite visible. The district judge declared "[t]he fact that it was dark would only make [the flashers] more visible." Transcript at 345.

The majority suggests that because Bebout was in a position to hear the whistle and did not hear it, any speculation concerning his attention "invades the province of the jury," Maj. at 1180.[6] I disagree, because examining whether a witness had an attitude of attention is the function of the court. *See Rakers,* 290 N.E.2d at 429. The district court holding that Stephen Bebout lacked an "attitude of attention" merely constitutes an application of the law which favors affirmative evidence (three witnesses heard the whistle) over negative evidence (three witnesses who lacked attention did not hear the whistle, not one of them testified that the whistle did not sound but only that they had not heard it which calls into question the focus of their attention at the particular moment). The majority relies only on the testimony of Stephen Bebout—claiming he looked both ways—and concludes that he had an attitude of attention but obviously he did not see what was in plain view. At least five factors suggest Bebout did not have an attitude of attention: (1) he did not hear the whistle, (2) he failed to see the flashing lights, (3) despite having a one-quarter-mile unobstructed view, he failed to see the headlight on the engine, (4) he failed to either see or hear the rumbling, rolling mile and one-half long freight train itself, and (5) his testimony is self-serving. The plaintiff claims he neither saw nor heard anything; obviously he was not paying attention or he is a prevaricator.

The entire discussion concerning negative evidence must be considered in light of

---

**6.** I agree with the majority that vision and hearing are distinct senses but I disagree that hearing is more precise than sight for I have been unable to discover any medical support for this theory. I also disagree with the majority's baseball example. The only reason an umpire listens for the sound of the ball hitting the first baseman's glove is that all too frequently because of the different positions of the baserunner and the first baseman's glove reaching for the throw the umpire's vision is obscured and he is unable to observe the base and the glove simultaneously—thus he listens for the ball and watches for the moment when the runner's foot lands on the base.

creating a triable issue of fact. If there was one scintilla of evidence in the record from any witness that the whistle did not blow, I agree a triable issue of fact might have existed. But the mere testimony that "I did not hear the whistle" is of no probative value and is insufficient to create a triable issue of fact unless the witness had an attitude of attention and was in proximity. Clearly the trial judge's determination of the witness' attitude of attention does not invade the province of the jury as the majority suggests. In *Rakers,* the Illinois appellate court overturned a jury verdict and held that the negative evidence (three witnesses failed to hear the whistle blow) was insufficient to create an issue of fact for the jury in light of the evidence that three witnesses testified that they heard the whistle blow. *Rakers,* 290 N.E.2d at 429. *See also Robertson,* 58 N.E.2d at 529 ("[t]he testimony of the witnesses to the effect that they heard no bell or whistle was merely negative in its character and did not tend to raise an issue of fact as to whether or not the whistle was blown or the bell rung").

The majority's reliance on *Knott v. Chicago & Eastern Illinois R.R. Co.,* 73 Ill. App.3d 707, 29 Ill.Dec. 760, 392 N.E.2d 317 (1979), is misplaced because that case turned on the fact that the deceased's vision was obstructed by dense fog. *Id.* 29 Ill.Dec. at 763, 392 N.E.2d at 320. In the factual situation presented to this court, there was no fog, nor any obstruction of Bebout's vision, in fact, the plaintiff had a one-quarter-mile unobstructed view of the oncoming mile and one-half long freight train because of an empty field south of the crossing. There were no trees, buildings or dense fog, and the sun had set in the west as he was proceeding in an easterly direction making the sky in front of him darker, thus the difference in illumination made the engine headlight and the flashing lights at the crossing even more visible. Thus, *Knott* is clearly distinguishable.

After hearing the testimony of all of the witnesses including the evidence of the train crew who testified that the whistle was blowing (in fact the front brakeman testified that he could not activate the short blow cycle because the long blast mechanism was already operative), the district judge found that the evidence "could not support a reasonable finding that the whistle wasn't being blown." I agree. It is interesting to note that not one witness gave positive direct testimony that the whistle was not blown, nor did any witness affirmatively testify that his or her *"attitude of attention was such that if the bell or whistle had sounded it would have attracted his attentions."* *Rakers,* 290 N.E.2d at 428 (emphasis added). In summation, the plaintiffs' evidence is without probative value and is nothing more than three witnesses who failed to demonstrate on the record the attitude of attention required to hear the train whistle blow. The testimony thus leads to one of three possible inferences: a) that the whistle was blowing but the witnesses did not hear it; b) that the whistle was not blown, or c) that the whistle was not heard by the driver or others because they lacked the necessary attention. On the other hand there is direct positive testimony by three witnesses that the whistle did blow.

"We, therefore, have a case belonging to that class of cases where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover."

*Pennsylvania R.R. Co. v. Chamberlain,* 288 U.S. 333, 339, 53 S.Ct. 391, 393, 77 L.Ed. 819 (1933). In view of the plaintiffs' failure to establish by a preponderance of the evidence that the inference that the whistle was not blowing, along with the positive testimony of the crew men that the whistle was blowing, I would hold that the district court did not commit error in ruling that there was insufficient evidence that the whistle was not blowing to support a jury verdict in favor of the plaintiffs.[7] I

---

7. The fact that the witnesses who testified that     the whistle was blowing were railroad employ-

fully agree with the district court which "f[ound] no basis for negligence in the operation of the train or maintenance of the signal equipment that was a proximate cause of the occurrence."

### III. CONCLUSION

I concur with the majority's conclusion that the district court's granting of the defendant's directed verdict motion was proper on the issues of whether the train was traveling too fast, whether it should have applied the emergency brake and whether the flashing lights were operating immediately prior to and continuing through the moment of the accident. However, the majority concludes that because Stephen Bebout testified that he looked both ways there is a question for the jury as to whether he had an attitude of attention to hear the whistle. This conclusion lacks support in the record because (1) Bebout did not see the flashing lights (the undisputed evidence establishes they were flashing), (2) he did not see the headlight on the engine, (3) even with an obstructed view of one-quarter mile across an open field he neither saw nor heard the mile and one-half long freight train approaching at 40 mph, (4) three witnesses testified that the whistle was blowing, and (5) the district judge appropriately discounted the testimony of Dorothy Varboncoeur and Jerry Tomes because they also lacked the necessary attitude of attention. Thus, in light of Bebout's failure to exercise his duty of due care by not entering the railroad crossing with a train immediately approaching, it is evident Stephen Bebout failed to exhibit the appropriate "attitude of attention" for his testimony to create a triable issue of fact. Accordingly, I am forced to dissent from the judgment of the court and from the holding that a triable issue of fact exists regarding whether the train whistle was blown.

Finally, I question the futility of this litigation and the waste of the court's valuable resources of time and money. Clearly if a new trial is held, after a jury hears the testimony of the three other potential defense witnesses (*see* note 2) as well as the other defense witnesses it will be necessary for the judge again to render a directed verdict for the defense. Thus this exercise will only serve to prolong a futile proceeding and enrich the attorneys' wealth of experience as well as their bank accounts and contribute to the overloading of an already strained civil court calendar.

ees does not require a different conclusion. *See* *Chamberlain*, 288 U.S. at 343, 53 S.Ct. at 394.